1  David C. Powell (SBN 129781)
   Courtland C. Chillingworth (SBN 261140)
2  REED SMITH LLP
   101 Second Street
3  Suite 1800
   San Francisco, CA 94105
4  Tel: (415) 543-8700
   Fax: (415) 391-8269
5
   *Attorneys for Plaintiff*
6  *Bank of America, N.A.*

ORIGINAL FILED

MAR 3 1 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7              **UNITED STATES DISTRICT COURT**

8              **NORTHERN DISTRICT OF CALIFORNIA**

9  BANK OF AMERICA, N.A.,

10                    Plaintiff,

11            vs.

12  ROBIN P. ARKLEY, II, a resident and citizen
    of California, in his individual capacity, and in
13  his capacity as co-trustee of The Robin P.
    Arkley, II and Cherie Arkley Family Trust
14  dated November 2, 1995 and restated and/or
    amended November 27, 2003, January 18,
15  2007 and September 26, 2007 (the "Family
    Trust") and co-trustee of The Robin and
16  Cherie Arkley Revocable Algiers Bancorp
    Stock Trust date unknown (the "Algiers
17  Trust"), and CHERIE ARKLEY, a resident
    and citizen of California, in her capacity as co-
18  trustee of The Family Trust and her capacity
    as co-trustee of the Algiers Trust,

19
                      Defendants.
20

**CV 10 1373**

Civ. Action No.:

**COMPLAINT**

**BZ**

**E-filing**

21

22       Plaintiff, Bank of America, N.A. ("Bank of America"), by and through its attorneys,

23  complains of Defendant, Robin P. Arkley , II ("Defendant" or "Robin Arkley"), Individually, and

24  Defendants Robin P. Arkley, II and Cherie Arkley ("Cherie Arkley"), Co-Trustees of the Robin P.

25  Arkley, II and Cherie Arkley Family Trust dated November 2, 1995, and restated and/or amended

26  November 27, 2003, January 18, 2007, and September 26, 2007 (the "Family Trust"), and Co-

27  Trustees of the Robin and Cherie Arkley Revocable Algiers Bancorp Stock Trust, date unknown (the

28  "Algiers Trust"), as follows:

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**The Parties**

1.      Plaintiff ("Bank of America") is a national banking association duly organized and existing under the laws of the United States of America that maintains its corporate offices in Charlotte, North Carolina.

2.      Defendant Robin Arkley is a United States citizen and a resident of the State of California.  Upon information and belief, Robin Arkley resides at 2399 D Street, Eureka, California, 95501-4156.

3.      Robin Arkley is co-trustee and co-settlor of two revocable California trusts:  the Family Trust and the Algiers Trust.  Pursuant to California law, including Cal. Prob. Code § 18200, the property of the Family Trust and the Algiers Trust may be used to satisfy Bank of America's claims against Robin Arkley as alleged herein.

4.      Defendant Cherie Arkley is a United States citizen and a resident of the State of California.  Upon information and belief, she also resides at 2399 D Street, Eureka, California, 95501-4156.  Along with Robin Arkley, Cherie Arkley is co-trustee and co-settlor of the Family Trust and the Algiers Trust.

**Jurisdiction and Venue**

5.      This Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332, in that Plaintiff and Defendant are of diverse citizenship, and the matter in controversy, exclusive of interest and costs, exceeds $75,000.

6.      Venue is proper pursuant 28 U.S.C. § 1391(a)(1) and (3) in that, to the best available knowledge of Bank of America, Robin Arkley and Cherie Arkley reside within Humboldt County, California.   In addition, upon information and belief, the Family Trust owns property in Humboldt County.  Humboldt County is contained within the Northern District of California.

**Intradistrict Assignment**

7.      The San Francisco or Oakland Divisions are the proper divisions of this Court for assignment, pursuant to Civil Local Rule 3-2(c), in that, to the best available knowledge of Bank of America, Robin Arkley and Cherie Arkley reside within Humboldt County, California.  Moreover,

COMPLAINT FOR DAMAGES

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   in addition, upon information and belief, the Family Trust owns property in Humboldt County.

2   Humboldt County is contained within the Northern District of California.

3                    **The Original Loan Agreement and Servicing Agreement**

4        8.      On or about May 27, 2005, Sequoia Funding Trust ("Sequoia"), a Delaware statutory

5   trust, entered into a warehouse facility agreement with Kitty Hawk Funding Corp. ("Kitty Hawk"),

6   as Conduit Lender, Bank of America, as Administrative Agent, Administrator, an Alternate Lender

7   and a Managing Agent, and a handful of other entities (the "Original Loan Agreement").

8        9.      The Original Loan Agreement was established to finance a discrete pool of residential

9   and commercial mortgage loans purchased from third-party originators (the "Mortgage Loan"). The

10  portfolio consisted primarily of first-lien mortgage loans secured by single- and multi-family

11  residential properties situated in forty-four states

12       10.     Pursuant to the terms of the Original Loan Agreement, the financing extended by

13  Bank of America and Kitty Hawk to Sequoia had a stated maturity date of August 19, 2006.

14       11.     In connection with the Original Loan Agreement's execution, on or about May 27,

15  2005, Sequoia, Bank of America and others entered into a Servicing and Custodian Agreement with

16  a Sequoia affiliate, SN Servicing Corp., an Alaska corporation ("SN Servicing" and the "Servicing

17  Agreement").  SN Servicing is owned outright by Security National Master Holding Company, LLC

18  ("SHMHC"), the majority owner of which is the Family Trust.

19       12.     The Servicing Agreement provided, among other things, that SN Servicing would act

20  as the servicer (i.e., collecting payments, sending notices) for the Mortgage Loans.

21       13.     On or about July 29, 2005, the Servicing Agreement was amended (the "Amended

22  Servicing Agreement").

23                    **The Amended and Restated Loan Agreement**

24       14.     Subsequent to its execution, the Original Loan Agreement was amended by the

25  parties thereto on three separate occasions.

26       15.     On or about November 20, 2006, Sequoia, Kitty Hawk, Bank of America, and a

27  handful of other entities executed a fourth amendment to the Original Loan Agreement, which

28  amended and restated the parties obligations pursuant to the Original Loan Agreement, as

1   subsequently amended (the "Amended and Restated Restated Loan Agreement"). A true and correct

2   copy of the Restated Loan Agreement is attached hereto as Exhibit A.

### The Omnibus Amendment

16.   On July 25, 2007, the parties executed an Omnibus Amendment to the Amended and

Restated Loan Agreement and to the Servicing Agreement (the "Omnibus Amendment"). A true

and correct copy of the Omnibus Amendment is attached hereto as Exhibit B.

17.   Under sections 2.01(a) and 2.05(b) of the Omnibus Amendment, and pursuant to

section 4.1(e) of the Amended and Restated Loan Agreement, Sequoia agreed to make sufficient

payments to reduce the outstanding debt pursuant to the following schedule:

| Deadline | Outstanding Debt |
| --- | --- |
| July 31, 2007 | $124,393,422 |
| October 31, 2007 | $63,000,000 |
| January 31, 2008 | $37,000,000 |
| April 30, 2008 | $23,000,000 |
| July 22, 2008 | $0 |

18.   Under section 2.14 of the Omnibus Amendment, the parties agreed that an Event of

Default would occur, among other things, if the outstanding debt exceeded 80% of the aggregate

estimated recovery value for all mortgage loans portfolio (the "80% ERV Ratio Obligation").

### The Arkley Guaranty

19.   In connection with, and as an inducement for, Bank of America entering into the

Omnibus Amendment, Robin Arkley executed a Continuing Guaranty (the "Arkley Guaranty"). A

true and correct copy of the Arkley Guaranty is attached hereto as Exhibit C.

20.   Security National Holding Company, LLC ("Security National") also provided a

guaranty agreement in connection with, and as an inducement for, Bank of America entering into the

Omnibus Amendment.

21.   Pursuant to the Arkley Guaranty, Robin Arkley absolutely and unconditionally

agreed, among other things, to pay to Bank of America, on demand, all sums due and to become due

as a result of Sequoia's default under, among other things, the Amended and Restated Loan

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Agreement, as amended, modified, supplemented, or restated from time to time, and the Omnibus

2    Amendment.

3        22.    The Arkley Guaranty further provides that Robin Arkley's obligations under the

4    Arkley Guaranty are those of a primary obligor, and are independent of Sequoia's obligations to

5    Bank of America. The Arkley Guaranty states that it is a guaranty of payment and performance by

6    Arkley, and not merely as a guaranty of collection, on the Stated Maturity Date – whether such date

7    occurs upon acceleration, demand or otherwise – of all of Sequoia's obligations under the Amended

8    and Restated Loan and the Omnibus Amendment.

9        23.    Additionally, the Arkley Guaranty provides that Robin Arkley shall pay, on demand,

10   all reasonable out-of-pocket expenses, including reasonable attorneys' fees and expenses and the

11   allocated cost and disbursements of internal legal counsel, in any way relating to the enforcement or

12   protection of Bank of America's rights under the Arkley Guaranty or in respect of Sequoia's

13   obligations to Bank of America, including any such expenses incurred during any "workout" or

14   restructuring period and/or in the preservation, protection or enforcement of any rights of Bank of

15   America in any legal proceedings.

16       24.    Finally, Robin Arkley further agreed in the Arkley Guaranty that, until Sequoia's

17   obligations to Bank of America have been paid in full, Arkley will maintain a minimum net worth of

18   at least $50,000,000.

19                                    **Default by Sequoia**

20       25.    Subsequent to the execution of the Omnibus Amendment, and beginning on or about

21   September 21, 2007, a number of Events of Default occurred, including, among other things,

22   violations of the 80% ERV Ratio Obligation.

23       26.    In an effort to address the Events of Default, the parties to the Amended and Restated

24   Loan Agreement and the Omnibus Amendment executed a total of twelve forbearance agreements.

25       27.    The Twelfth Forbearance Agreement was executed on or about January 30, 2009, and

26   provided for an expiration date of March 27, 2009, which subsequently was extended until July 22,

27   2009.

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

28.     Sequoia is in default under the Amended and Restated Loan Agreement and the Omnibus Amendment because, among other things, Sequoia has failed to make payments due to Bank of America and has failed to cure such Events of Default.

29.     By letter, dated July 31, 2009, Bank of America notified Sequoia that Events of Default occurred under the Amended and Restated Loan Agreement and the Omnibus Amendment (the "Default Notice"). Accordingly, and pursuant to Section 11.2 of the Amended and Restated Loan Agreement, Bank of America made demand upon Sequoia for payment of $89,287,055, representing the full outstanding debt balance, as well as all accrued and unpaid interest on the principal balance as of July 31, 2009 at the specified default interest rate. A true and correct copy of the Default Notice is attached hereto as Exhibit D.

### The Liquidation Notice and Sale of the Collateral

30.     On August 5, 2009, Bank of America notified Sequoia, SN Servicing, Robin Arkley and Security National that it would sell the underlying collateral at a public action on August 25, 2009 (the "Liquidation Notice"). A true and correct copy of the Liquidation Notice is attached hereto as Exhibit E.

31.     Among other things, Bank of America notified the recipients of the Liquidation Notice that, in the event the proceeds from the sale are insufficient to satisfy Sequoia's outstanding obligations to Bank of America, Sequoia, as well as Security National and Robin Arkley, each shall remain jointly and severally liable for any deficiency.

32.     On or about August 10, 2009, Bank of America announced the public auction, advising that the initial bid deadline would be August 20, 2009. Bank of America notified at least eighty-seven separate potential bidders of the public auction.

33.     On August 25, 2009, Bank of America held a public auction to sell Sequoia's right, title and interest in, to and under the mortgage loans and the related servicing rights. The public auction of the collateral was conducted at the time, place and manner customary in the industry for the sale of mortgage loans.

34.     At the auction, only $79,249,389 of the total $89,713,770 in available collateral assets were subject to final sale. Certain of the underlying collateral constituting real estate owned

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    properties, or properties owned by Sequoia as a result of foreclosure and/or forfeiture ("REOs"),

2    with a underlying mortgage loan balance of $10,464,381, were not subject to public auction and sale.

3    The REOs remain owned in title by Sequoia.

4        35.    After reviewing the auction bids, Bank of America determined that its own credit bid

5    of $39,358,704, representing 49.67% of the aggregate outstanding principal balance of the mortgage

6    loans being auctioned, was the highest bid submitted at the auction and was, therefore, the best bid

7    (the "Purchase Price").  Notably, the next highest bid submitted at auction was $35,885,508, but this

8    bid was not binding and was subject to price adjustments.

9        36.    On August 27, 2009, Bank of America consummated the sale of the mortgage loans,

10   related documentation and related servicing rights for a purchase price affected through a credit bid

11   of $39,358,704.   Title and ownership of the mortgage loan collateral (including the related

12   documentation and related servicing rights) was sold, transferred, assigned and conveyed to Bank of

13   America.

14       37.    Bank of America applied the Purchase Price to the outstanding obligations and

15   determined that as of the close of business on August 25, 2009, after application of the Purchase

16   Price, the aggregate amount of obligations outstanding totaled $49,928,351, plus accrued interest,

17   fees, costs of collection, and enforcement.

18       38.    By letter, dated on or about September 4, 2009, Bank of America notified Sequoia

19   and SN Servicing of the auction sale (the "September 4 Letter").  In the September 4 Letter, Bank of

20   America notified these parties that Sequoia, Security National and Robin Arkley remained liable for

21   the remaining deficiency totaling $49,928,351, plus accrued interest, fees, costs of collection, and

22   enforcement (the "Deficiency Amount").

23                **COUNT I – BREACH OF CONTRACT**

24       39.    Bank of America repeats and re-alleges all of the allegations contained in the

25   preceding paragraphs of the Complaint as if same fully were set forth at length herein.

26       40.    Bank of America fully has performed all obligations under the Arkley Guaranty, the

27   Amended and Restated Loan Agreement, and the Omnibus Amendment.

28

**COMPLAINT FOR DAMAGES**

41.     Based on the foregoing, Sequoia is in breach of the Amended and Restated Loan Agreement, and the Omnibus Amendment.

42.     Pursuant to the Arkley Guaranty, Robin Arkley is liable, jointly and severally, for the Deficiency Amount owing to Bank of America.

43.     Based on the foregoing, Robin Arkley has breached his obligations to Bank of America under the Arkley Guaranty by failing to pay the Deficiency Amount as demanded by Bank of America.

44.     The Arkley Guaranty provides, among other things, that Bank of America shall recover its attorneys' fees, costs of collection, and interest on all unpaid amounts due and owing at the default interest rate.

COMPLAINT FOR DAMAGES

1    WHEREFORE, Bank of America prays that this Court enter a judgment in its favor and

2    against Robin Arkley, jointly and severally, for all amounts due under the Arkley Guaranty, the

3    Amended and Restated Loan Agreement, and the Omnibus Amendment, not less than $49,928,351,

4    plus accrued interest at the default interest rate, fees and costs of collection and enforcement,

5    including Bank of America's attorneys' fees, together with such other and further relief as shall be

6    just and equitable.

7    Dated: March 30, 2010

8

9    By: _____

10   David C. Powell
     Email: dpowell@reedsmith.com
     Courtland C. Chillingworth
11   Email: cchillingworth@reedsmith.com
     REED SMITH LLP
12   101 Second Street
     Suite 1800
13   San Francisco, CA 94105
     Tel: (415) 543-8700
14   Fax: (415) 391-8269

15   Mark L. Tamburri
     (*pro hac vice* admission pending)
16   Email: mtamburri@reedsmith.com
     REED SMITH LLP
17   Reed Smith Centre
     225 Fifth Avenue
18   Pittsburgh, PA 15219
     Tel: (412) 288-3131
19   Fax: (412) 288-3063

20   *Attorneys for Plaintiff*
     *Bank of America, N.A.*

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COMPLAINT FOR DAMAGES

# EXHIBIT A

**EXECUTION COPY**

AMENDED AND RESTATED LOAN AGREEMENT

dated as of November 20, 2006

among

SEQUOIA FUNDING TRUST,

as Borrower

KITTY HAWK FUNDING CORPORATION,

as Conduit Lender

BANK OF AMERICA, NATIONAL ASSOCIATION,

as Administrative Agent, Administrator, and as an Alternate Lender and Managing Agent

and

THE OTHER CONDUIT LENDERS, ADMINISTRATORS, ALTERNATE LENDERS AND
MANAGING AGENTS,

from time to time party hereto

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS ................................................................................................. 1
     SECTION 1.1    Defined Terms ............................................................................ 1
     SECTION 1.2    Other Definitional Provisions ............................................... 28
     SECTION 1.3    Other Terms ........................................................................... 29
     SECTION 1.4    Computation of Time Periods .............................................. 29

ARTICLE II      THE COMMITMENT, BORROWING PROCEDURES AND NOTE ........ 29
     SECTION 2.1    Commitment to Lend ............................................................ 29
     SECTION 2.2    Borrowing Procedures ......................................................... 30
     SECTION 2.3    Conduit Lender Acceptance or Rejection; Borrowing Request
                             Irrevocable ............................................................................ 30
     SECTION 2.4    Right to Replace Defaulting Alternate Lender ................... 32
     SECTION 2.5    Representation and Warranty ............................................... 32
     SECTION 2.6    [Reserved] ............................................................................. 32
     SECTION 2.7    Voluntary Termination of Commitments; Reduction of Facility
                             Limit ...................................................................................... 32
     SECTION 2.8    Note ....................................................................................... 33

ARTICLE III      INTEREST, FEES, ETC ........................................................................... 33
     SECTION 3.1    Interest Rates ......................................................................... 33
     SECTION 3.2    Interest Payment Dates ........................................................ 34
     SECTION 3.3    Fees ....................................................................................... 34
     SECTION 3.4    Computation of Interest and Fees ....................................... 34
     SECTION 3.5    Eurodollar Disruption Event ............................................... 34

ARTICLE IV      REPAYMENTS AND PREPAYMENTS; DISTRIBUTION OF
                  COLLECTIONS ...................................................................................... 35
     SECTION 4.1    Repayments and Prepayments ............................................ 35
     SECTION 4.2    Distribution of Collections ................................................... 35
     SECTION 4.3    Spread Account ..................................................................... 38
     SECTION 4.4    Draws on the Performance Guaranty ................................. 39

ARTICLE V      PAYMENTS ............................................................................................. 39
     SECTION 5.1    Making of Payments ............................................................ 39
     SECTION 5.2    [Reserved] ............................................................................. 40
     SECTION 5.3    Due Date Extension .............................................................. 40
     SECTION 5.4    Sharing of Payments, Etc .................................................... 40

ARTICLE VI      ADDITIONAL ALTERNATE LENDER PROVISIONS ............................ 40
     SECTION 6.1    Assignment to Alternate Lenders ....................................... 40
     SECTION 6.2    Downgrade of Alternate Lender ......................................... 42
     SECTION 6.3    Request for Renewal of Commitments ............................... 44

ARTICLE VII      INCREASED COSTS, ETC ..................................................................... 44

**TABLE OF CONTENTS**
(continued)

Page

SECTION 7.1    Breakage Costs.................................................................. 44
SECTION 7.2    Indemnity for Taxes, Reserves and Expenses...................... 44
SECTION 7.3    Taxes.............................................................................. 46

ARTICLE VIII    CONDITIONS TO BORROWING ............................... 47

SECTION 8.1    Initial Loan..................................................................... 47
SECTION 8.2    All Loans........................................................................ 49

ARTICLE IX    REPRESENTATIONS AND WARRANTIES.................. 50

SECTION 9.1    Organization and Good Standing, etc ............................... 50
SECTION 9.2    Power and Authority; Due Authorization ......................... 50
SECTION 9.3    No Violation.................................................................... 50
SECTION 9.4    Validity and Binding Nature ........................................... 50
SECTION 9.5    Bulk Sales Act................................................................ 51
SECTION 9.6    Government Approvals..................................................... 51
SECTION 9.7    Financial Condition......................................................... 51
SECTION 9.8    Margin Regulations......................................................... 51
SECTION 9.9    Quality of Title............................................................... 51
SECTION 9.10    Accuracy of Information .................................................. 51
SECTION 9.11    Offices............................................................................ 52
SECTION 9.12    Capitalization ................................................................. 52
SECTION 9.13    Trade Names .................................................................. 52
SECTION 9.14    Taxes.............................................................................. 52
SECTION 9.15    Compliance with Applicable Laws; Licenses, etc ............. 52
SECTION 9.16    No Proceedings .............................................................. 52
SECTION 9.17    Investment Company Act, Etc ......................................... 53
SECTION 9.18    Eligible Warehouse Assets .............................................. 53
SECTION 9.19    UCC Representations, Warranties and Agreements ........... 53
SECTION 9.20    Certain Environmental Representations ............................ 56
SECTION 9.21    Anti-money Laundering.................................................... 57
SECTION 9.22    Credit Policy and Servicing Standards ............................. 57
SECTION 9.23    Default............................................................................ 57
SECTION 9.24    ERISA............................................................................ 57
SECTION 9.25    Transfers Under Sale and Contribution Agreement............ 58
SECTION 9.26    Preference; Voidability .................................................... 58
SECTION 9.27    Representations and Warranties in other Related Documents.......... 58

ARTICLE X    COVENANTS OF BORROWER........................................ 58

SECTION 10.1    Affirmative Covenants.................................................... 58
SECTION 10.2    Negative Covenants of Borrower...................................... 65

ARTICLE XI    EVENTS OF DEFAULT AND THEIR EFFECT ......... 68

SECTION 11.1    Events of Default ........................................................... 68
SECTION 11.2    Effect of Event of Default................................................ 70

## TABLE OF CONTENTS
(continued)

Page

ARTICLE XII    THE AGENT ............................................................................... 70

    SECTION 12.1    Appointment and Authorization of Agents ......................................... 70
    SECTION 12.2    Delegation of Duties ............................................................. 71
    SECTION 12.3    Exculpatory Provisions .......................................................... 71
    SECTION 12.4    Reliance on Communications ..................................................... 72
    SECTION 12.5    Notice of Default .................................................................. 72
    SECTION 12.6    Non-Reliance on Agents and Other Lenders ..................................... 73
    SECTION 12.7    Indemnification .................................................................... 73
    SECTION 12.8    Agents in Their Individual Capacity ............................................. 74
    SECTION 12.9    Successor Agent .................................................................... 74
    SECTION 12.10   Payments by the Agent ............................................................ 75

ARTICLE XIII    ASSIGNMENTS ......................................................................... 75

    SECTION 13.1    Restrictions on Assignments ..................................................... 75
    SECTION 13.2    Assignments by Alternate Lenders and the Conduit Lenders ............ 75

ARTICLE XIV    INDEMNIFICATION ................................................................... 78

    SECTION 14.1    General Indemnity of Borrower ................................................... 78
    SECTION 14.2    Contribution ........................................................................ 80

ARTICLE XV    MISCELLANEOUS ..................................................................... 80

    SECTION 15.1    No Waiver; Remedies .............................................................. 80
    SECTION 15.2    Amendments, Etc .................................................................. 81
    SECTION 15.3    Notices, Etc ........................................................................ 82
    SECTION 15.4    Costs, Expenses and Taxes ....................................................... 82
    SECTION 15.5    Binding Effect; Survival .......................................................... 82
    SECTION 15.6    Captions ............................................................................. 83
    SECTION 15.7    Severability ........................................................................ 83
    SECTION 15.8    GOVERNING LAW, SUBMISSION TO JURISDICTION ............ 83
    SECTION 15.9    Counterparts ....................................................................... 83
    SECTION 15.10   WAIVER OF JURY TRIAL ...................................................... 83
    SECTION 15.11   Recourse to Directors or Officers ............................................... 84
    SECTION 15.12   No Proceedings .................................................................... 84
    SECTION 15.13   Limitation of Liability of Trustee ............................................... 84
    SECTION 15.14   ENTIRE AGREEMENT ......................................................... 85
    SECTION 15.15   Confidentiality ..................................................................... 85
    SECTION 15.16   USA Patriot Act Notice ........................................................... 85
    SECTION 15.17   Amendment and Restatement ................................................... 85

EXHIBIT 1.1(a)          Eligibility Requirements
EXHIBIT 1.1(b)          Form of Forbearance Letter
EXHIBIT 1.1(c)          Estimated Recovery Value Percentages
EXHIBIT 2.2             Form of Borrowing Request
EXHIBIT 2.8             Form of Note
EXHIBIT 10.1.9(c)-1     Form of Monthly Report
EXHIBIT 10.1.9(c)-2     Form of Borrowing Base Certificate
EXHIBIT 10.2.1          Form of Take-Out Securitization Assignment Agreement
EXHIBIT 13.2            Form of Assignment Agreement


Schedule 1.1(a)         List of Entities Included as Part of Servicing Portfolio
Schedule 8.20           List of Certain Environmental Issues
Schedule 10.1.7         Description of Credit Policy
Schedule 15.3           Notice Addresses and Party Information

## AMENDED AND RESTATED LOAN AGREEMENT

THIS AMENDED AND RESTATED LOAN AGREEMENT is made and entered into as of November 20, 2006, among SEQUOIA FUNDING TRUST, a Delaware statutory trust (the "Borrower"), KITTY HAWK FUNDING CORPORATION, a Delaware corporation, as Conduit Lender, BANK OF AMERICA, NATIONAL ASSOCIATION, as Administrative Agent, an Administrator, an Alternate Lender and a Managing Agent, and the other Persons from time to time parties hereto as Lenders, Managing Agents and Administrators.

### BACKGROUND

1.      Borrower, Kitty Hawk, Administrative Agent and certain of the Lenders entered into a Loan Agreement, dated May 27, 2005 (the "Original Loan Agreement"), which they now wish to amend and restate in its entirety hereby.

2.      Borrower desires that the Lenders extend financing to Borrower on the terms and conditions set forth herein.

3.      The Lenders are willing to provide such financing on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

SECTION 1.1  Defined Terms.  As used in this Agreement, the following terms have the following meanings:

"Additional Costs" has the meaning set forth in Section 7.2.

"Adjustable Rate Mortgage Loan" means a Mortgage Loan as to which the related Mortgage Note provides for an interest rate that varies from time to time based on the then current value of a floating index and margin as provided therein.

"Adjusted Principal Balance" means, at any time of determination, the aggregate of:

(A)      with respect to each Eligible Warehouse Asset that is a REMIC Eligible Mortgage Loan, the lesser of:  (a) the applicable Advance Rate for REMIC Eligible Mortgage Loans times the aggregate unpaid principal balance of all REMIC Eligible Mortgage Loans as of such date, and (b) the applicable Maximum Purchase Rate for REMIC Eligible Mortgage Loans times the lesser of: (i) the aggregate Mortgage Loan Purchase Price for all REMIC Eligible Mortgage Loans, and (ii) the aggregate Market Value for all REMIC Eligible Mortgage Loans (provided, that, this clause (b)(ii) shall only apply to REMIC Eligible Mortgage Loans where a Market Value is available, and

all REMIC Eligible Mortgage Loans where no Market Value is available shall be calculated with reference to clause (b)(i) above);

(B)     with respect to each Eligible Warehouse Asset that is a Converted REMIC Eligible Mortgage Loan, the lesser of:  (a) the applicable Advance Rate for Converted REMIC Eligible Mortgage Loans times the aggregate unpaid principal balance of all Converted REMIC Eligible Mortgage Loans as of such date, and (b) the applicable Maximum Purchase Rate for Converted REMIC Eligible Mortgage Loans times the aggregate Market Value for all Converted REMIC Eligible Mortgage Loans;

(C)     with respect to each Eligible Warehouse Asset that is a Non-REMIC Eligible Mortgage Loan, the lesser of: (a) the applicable Advance Rate for Non-REMIC Eligible Mortgage Loans times the aggregate ERV for all Non-REMIC Eligible Mortgage Loans as of such date, and (b) the applicable Maximum Purchase Rate for Non-REMIC Eligible Mortgage Loans times the lesser of: (i) the aggregate Mortgage Loan Purchase Price for all Non-REMIC Eligible Mortgage Loans, and (ii) the aggregate Market Value for all Non-REMIC Eligible Mortgage Loans (provided, that, this clause (b)(ii) shall only apply to Non-REMIC Eligible Mortgage Loans where a Market Value is available, and all Non-REMIC Eligible Mortgage Loans where no Market Value is available shall be calculated with reference to clause (b)(i) above); and

(D)     with respect to each Eligible Warehouse Asset that is an REO Property, the lesser of: (a) the applicable Advance Rate for REO Properties times the aggregate ERV for all REO Properties as of such date, and (b) the applicable Maximum Purchase Rate for REO Properties times the lesser of: (i) the aggregate Mortgage Loan Purchase Price for all REO Properties, and (ii) the aggregate Market Value for all REO Properties (provided, that, this clause (b)(ii) shall only apply to REO Properties where a Market Value is available, and all REO Properties where no Market Value is available shall be calculated with reference to clause (b)(i)).

"Administration Agreement" means the Administration Agreement, dated as of the Closing Date, between the Borrower and SN Servicing Corporation, as administrator.

"Administrative Agent" means Bank of America (or any successor thereto) in its capacity as agent for the Lenders or any successor administrative agent appointed pursuant to Section 12.9.

"Administrative Agent's Account" has the meaning set forth in Section 5.1.

"Administrator" means: (i) with respect to Kitty Hawk, Bank of America or an Affiliate thereof, or (ii) with respect to any other Conduit Lender, the Person designated by such Conduit Lender as its "Administrator" which becomes a party to the Agreement in such capacity.

"Advance Rate" means, at any time of determination, with respect to each category of Eligible Warehouse Asset described below:

(a)     For any Warehouse Asset that is a REMIC Eligible Mortgage Loan, 90%;

(b)    For any Warehouse Asset that is a Converted REMIC Eligible Mortgage Loan, 90%; and

(c)    For any Warehouse Asset that is a Non-REMIC Eligible Mortgage Loan (including REO Properties), 78%.

"Adverse Claim" means a lien, security interest, pledge, charge or encumbrance, or other right or claim in, of or on any Person's assets or properties in favor of any other Person (including any UCC financing statement or any similar instrument filed against such Person's assets or properties) other than a Permitted Lien.

"Affected Party" means each of the Agents, the Lenders, the Liquidity Banks, any permitted assignee of the Agents, the Lenders or the Liquidity Banks, any applicable Program Support Provider, the Administrative Agent and the holding company of any of the Liquidity Banks or the Program Support Providers and any successor holding company thereof.

"Affiliate" of any Person, means any other Person that (i) directly or indirectly controls, is controlled by or is under common control with such Person (excluding any trustee under, or any committee with responsibility for administering, any employee benefit plan) or (ii) is an officer or director of such Person. A Person shall be deemed to be "controlled by" any other Person if such other Person possesses, directly or indirectly, power

(a)    to vote 5% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managing partners or members; or

(b)    to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

The word "Affiliated" has a correlative meaning.

"Agent-Related Person" means each Agent, together with its Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and their respective Affiliates.

"Agents" mean the Administrative Agent, the Administrators, and the Managing Agents and any successors and assigns in such capacities.

"Agreement" shall mean this Amended and Restated Loan Agreement.

"Alternate Lender Percentage" means, with respect to any Lender Group, at any time, a fraction, expressed as a percentage, the numerator of which is the portion of the Net Investment funded by the Alternate Lenders of such Lender Group and the denominator of which is the aggregate Net Investment at such time of such Lender Group; *provided* that at all times on and after the first Assignment Date occurring on or after the Conduit Investment Termination Date for the Conduit Lender related to such Lender Group, the Alternate Lender Percentage for such Lender Group means 100%.

"Alternate Lenders" means: (i) for the Kitty Hawk Lender Group, Bank of America and any assignees thereof that shall become a party hereto pursuant to Section 13.2; and (ii) for any

other Lender Group, the "Alternate Lenders" specified therefor who become parties hereto and any assignees thereof that shall become parties hereto pursuant to Section 13.2.

"Alternate Rate" means, for any Interest Period for the related Loan (or any portion thereof), an interest rate per annum equal to the Eurodollar Rate (Reserve Adjusted), plus 0.50%; *provided, however*, that the Alternate Rate for any outstanding principal amount of any Loan allocated to an Interest Period shall be the Base Rate plus 0.50% if:

(a)  on or before the first day of such Interest Period, the applicable Lender or any applicable Liquidity Bank shall have notified the Administrative Agent and the Servicer that a Eurodollar Disruption Event has occurred;

(b)  such Interest Period is a period of less than 14 days;

(c)  the outstanding principal amount of such Loan (or applicable portion thereof) is less than $5,000,000; or

(d)  the applicable Managing Agent shall not have received a request for such Loan pursuant to Section 2.2 hereof, prior to 11:00 a.m. (New York City time) on the third Business Day preceding the first day of such Interest Period that the Borrower desires the related Loan to be made; it being understood, that except as otherwise provided in clauses (a) through (c) of this proviso, any Loan accruing interest and based on the Base Rate solely as a result of this clause (d), shall, following the applicable funding date of such Loan, when the applicable Lender or applicable Liquidity Bank has determined the applicable Eurodollar Rate (Reserve Adjusted) for such Loan for such Interest Period (but not later than three Business Days following the funding date therefor), be automatically converted to a Loan for the remainder of such Interest Period, which accrues interest at a rate equal to the Eurodollar Rate (Reserve Adjusted) plus 0.50% per annum. Notwithstanding anything in this definition to the contrary, following the occurrence of any Event of Default, the Alternate Rate for any Loan during any Interest Period shall be deemed to be a per annum rate equal to the Base Rate plus 2.0%.

"Asset Interest" means the Administrative Agent's right, title and interest, for and on behalf of the Lenders, in and to all Loans hereunder and related Collateral therefor.

"Assignment Agreement" means an Assignment Agreement in the form of Exhibit 13.2.

"Assignment Amount" means, with respect to an Alternate Lender at the time of any assignment pursuant to Section 6.1.1 by the Conduit Lender in such Alternate Lender's Lender Group, an amount equal to the least of:  (a) such Alternate Lender's Pro Rata Share of the Net Investment requested by such Conduit Lender to be assigned at such time; (b) such Alternate Lender's unused Commitment (*minus* the unrecovered principal amount of such Alternate Lender's investments in the Asset Interest pursuant to the Liquidity Agreement to which it is a party); and (c) in the case of an assignment on or after the Conduit Investment Termination Date for the Conduit Lender related to such Lender Group, such Alternate Lender's Pro Rata Share of the applicable Conduit Lender Percentage of the Lender Group Percentage of the Borrowing Base.

"Assignment Date" has the meaning set forth in Section 6.1.1.

"<u>Assignment of Mortgage</u>" means, with respect to a Mortgage Loan, the executed instrument of assignment of the related Mortgage in recordable form and all other documents securing such Mortgage Loan which are in a form sufficient under the laws of the jurisdiction in which the Property which is the subject of such Mortgage is located to permit the assignee to exercise all rights granted by the Obligor under such Mortgage and such other documents and all rights available under applicable law to the obligee under such Mortgage Loan and which may, to the extent permitted by the laws of the state in which the Property is located, be a blanket instrument of assignment covering other Mortgages as well.

"<u>Backup Servicer</u>" means GMAC Mortgage, LLC, as the Backup Servicer under the Servicing and Custodian Agreement, together with its successors and permitted assigns in such capacity.

"<u>Backup Servicing Fee</u>" has the meaning set forth in <u>Section 5.01(I)(ii)</u> of the Servicing and Custodian Agreement.

"<u>Bank of America</u>" means Bank of America, N.A.

"<u>Bankruptcy Code</u>" or "<u>Code</u>" means the Bankruptcy Code, 11 U.S.C. § 101, <u>et seq.</u>, as amended, modified, succeeded or replaced from time to time.

"<u>BAS</u>" means Banc of America Securities LLC.

"<u>Base Rate</u>" means, for any Interest Period for the related Loan (or any portion thereof), a fluctuating rate of interest <u>per annum</u> equal to the higher of:

     (a)    the rate of interest in effect for such day as publicly announced from time to time by the related Managing Agent as its "*prime rate*". The "*prime rate*" is a rate set by such Managing Agent based upon various factors including such Managing Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in the prime rate announced by such Managing Agent shall take effect at the opening of business on the day specified in the public announcement of such change; or

     (b)    the Federal Funds Rate for such day plus 0.50% <u>per annum</u>.

"<u>Borrower</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Borrowing Base</u>" means, at any time of determination, an amount equal to: (i) the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets as of such date, <u>minus</u> (ii) the Excess Concentration Amount as of such date; <u>provided</u> that at no time shall such amount in <u>clause (i)</u> above exceed the aggregate Mortgage Loan Purchase Price for all Eligible Warehouse Assets.

"<u>Borrowing Base Certificate</u>" has the meaning set forth in <u>Section 10.1.9(c)</u>.

"<u>Borrowing Base Deficit</u>" means, at any time of determination, the extent to which (A) the aggregate outstanding principal balance of all Loans <u>minus</u>, so long as no Event of Default or

-5-

Unmatured Event of Default has occurred and is continuing, any unapplied principal collections on deposit in the Collection Account is in excess of (B) the Maximum Outstanding Principal Balance.

"Borrowing Request" has the meaning set forth in Section 2.2.

"BPO" means (a) with respect to any Property or REO Property, the value set forth in the most recent broker price opinion received with respect to such Property or REO Property, or (b) in the case of any broker listed REO Property, the value of such REO Property based on a comparative market analysis of similar properties, in either case, performed in accordance with standard industry practices for setting such values at such time by an experienced institution (a "BPO Valuation Institution") recognized in the mortgage industry as being reputable in connection with the determination of such BPO values; provided, however, if, at any time following each determination of the BPO with respect to any Warehouse Asset, the Administrative Agent, in its reasonable determination, notifies the Servicer in writing that it does not consent to the use of such BPO Valuation Institution to set the related BPO with respect to such Warehouse Asset, then the Servicer shall promptly (but in any event prior to the delivery of the next Monthly Report) obtain a new BPO for such Warehouse Asset from an alternate BPO Valuation Institution.

"Business Day" shall mean any day other than a Saturday, a Sunday or day on which (a) the Administrative Agent at its office in Charlotte, North Carolina is not authorized or required to be closed for business, (b) commercial banks in New York City or California are not authorized or required to be closed for business, and (c) in the case of a Business Day which relates to a Eurodollar Loan, dealings are carried on in the interbank eurodollar market.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendment and Reauthorization Act of 1986 and all other amendments thereto, together with the rules and regulations promulgated thereunder as in effect from time to time.

"Change in Control" means, any of (a) Security National Master Holding Company, LLC shall fail to own, directly or indirectly, free and clear of all Adverse Claims, 100% of the outstanding equity of SNHC or SNHC shall fail to own, directly or indirectly, free and clear of all Adverse Claims, 100% of the outstanding beneficial interest of Borrower, (b) the Arkley family shall fail to own, directly or indirectly, at least 90% of the outstanding beneficial interest and or voting stock of SNHC, or (c) both Rob Arkley and Jack Mendheim are no longer involved in the daily operations of the Borrower and/or SNHC, in their respective current capacities as of the date hereof, or in a capacity senior to their respective current capacities as of the date hereof, for a period in excess of six months.

"Closing Date" means May 27, 2005.

"Code" means the Internal Revenue Code of 1986.

"Collateral" has the meaning set forth in Section 2.1 of the Security Agreement.

"Collection Account" means that certain bank deposit account numbered 4121142343 maintained at Wells Fargo Bank, NA, which is (i) a blocked account subject to the Collection Account Agreement, (ii) identified as the "Sequoia Funding Trust/Bank of America Collection Account," and (iii) pledged, on a first-priority basis, to the Administrative Agent on behalf of the Secured Parties pursuant to the Security Agreement.

"Collection Account Agreement" means the Collection Account Agreement, dated as of the Closing Date, among Borrower, the Servicer, the Administrative Agent and the Collection Account Bank.

"Collection Account Bank" means the bank holding the Collection Account.

"Collections" means, with respect to each Warehouse Asset, all cash collections and other cash proceeds of such Warehouse Asset, including, without limitation, all (i) scheduled interest and principal payments received and collected on such Warehouse Asset, (ii) proceeds received by virtue of the liquidation of such Warehouse Asset, net of expenses incurred in connection with such liquidation, (iii) proceeds received (net of proceeds paid to or for the account of the relevant Obligor or Warehouse Asset) under any damage, casualty or other insurance policy with respect to such Warehouse Asset, (iv) proceeds received under any Interest Rate Agreement, (v) other proceeds including recoveries, sales proceeds or net proceeds from a Take-Out Securitization, relating to such Warehouse Asset, (vi) all cash proceeds of the Related Security with respect to such Warehouse Asset, and (vii) any repurchase payment received with respect to such Warehouse Asset pursuant to any applicable recourse obligation of the Borrower, the Servicer or any applicable Seller under this Agreement or any other Transaction Document.

"Combined Loan-to-Value Ratio" means, with respect to any Mortgage Loan, as of any date of determination, the ratio of (A) the Warehouse Asset Principal Balance thereof, to (B) the excess, if any, of (i) the BPO for the related Property on such date, over (ii) the principal balance of any lien senior to the lien created by the Mortgage related to such Mortgage Loan.

"Commercial Mortgage Loan" means a Mortgage Loan related to a commercial property, non-residential agricultural property, a multifamily residential property with five or more units or unimproved land.

"Commercial Paper" means the commercial paper, secured liquidity, or extended maturity notes issued or to be issued by a Conduit Lender (or its related note issuer if the Conduit Lender does not itself issue such notes) to fund or maintain the Loans or investments in other financial assets.

"Commercial Paper Rate" means, for any Interest Period for any Loan (or portion thereof) funded by a Conduit Lender of a Lender Group by issuing Commercial Paper, an interest rate *per annum* equal to the rate equivalent to the rate (or if more than one rate, the weighted average of the rates) at which Commercial Paper having a term equal to such Interest Period may be sold by any placement agent or commercial paper dealer selected by such Conduit Lender (as determined by the applicable Administrator and which (unless otherwise invoiced separately) shall include commissions of placement agents and dealers, incremental carrying costs incurred with respect to Commercial Paper maturing on dates other than those on which

corresponding funds are received by the Conduit Lender and any other costs associated with the issuance of Commercial Paper); *provided, however*, that if the rate (or rates) as agreed between any such agent or dealer and the Conduit Lender is a discount rate, then an interest rate (or if more than one rate, the weighted average of the rates) resulting from such Conduit Lender's converting such discount rate (or rates) to an interest-bearing equivalent rate per annum; or, with respect to any Lender Group that becomes a party hereto after the Closing Date, the "*Commercial Paper Rate*" specified by such Lender Group and approved by the Administrative Agent and Borrower. Notwithstanding anything in this definition to the contrary, the "Commercial Paper Rate" for any day following the occurrence of an Event of Default shall be an interest rate equal to 2.0% per annum above the Base Rate as in effect on such day.

"Commitment" means, with respect to each Alternate Lender, as the context requires: (a) the commitment of such Alternate Lender to make Loans and to pay Assignment Amounts in accordance herewith in an amount not to exceed the amount described in the following clause (b); and (b) the dollar amount set forth opposite such Alternate Lender's signature on the signature pages hereof under the heading "*Commitment*" (or in the case of an Alternate Lender which becomes a party hereto pursuant to an Assignment Agreement entered into pursuant to the terms hereof, as set forth in such Assignment Agreement); *minus* the dollar amount of any Commitment or portion thereof assigned by such Alternate Lender pursuant to an Assignment Agreement entered into pursuant to the terms hereof; *plus* the dollar amount of any increase to such Alternate Lender's Commitment consented to by such Alternate Lender prior to the time of determination; *provided, however*, that to the extent that the Facility Limit is reduced, the aggregate of the Commitments of all the Alternate Lenders shall decline by a like amount and the Commitment of each Alternate Lender shall decline in proportion thereto.

"Commitment Termination Date" means the earliest to occur of: (a) the Scheduled Commitment Termination Date, (b) the date following any Event of Default when the Commitments are terminated hereunder pursuant to Section 11.2 of the Agreement, (c) the date the Borrower elects to terminate the Commitment pursuant to Section 2.7 of the Agreement; and (d) unless the Administrative Agent elects otherwise, the date of termination of the commitment of all of the Liquidity Banks under their related Liquidity Agreements.

"Conduit Assignee" means any special purpose entity that finances its activities directly or indirectly through asset backed commercial paper and is administered by an Alternate Lender or any of its Affiliates and designated by such Alternate Lender from time to time to accept an assignment from a Conduit Lender of all or a portion of the Net Investment.

"Conduit Collateral Agent" means, with respect to any Conduit Lender, the "*Collateral Agent*" (if any) with respect to such Conduit Lender's commercial paper program.

"Conduit Investment Termination Date" means, with respect to any Conduit Lender, the date of the delivery by such Conduit Lender to Borrower of written notice that such Conduit Lender elects, in its sole discretion, not to make any further Loans.

"Conduit Lender" means: (i) Kitty Hawk and any permitted Conduit Assignee thereof; and (ii) any other Person that shall become a party to this Agreement as a "*Conduit Lender*" pursuant to the terms hereof.

"Conduit Lender Percentage" means, with respect to any Conduit Lender, at any time, 100%, *less* the Alternate Lender Percentage of such Conduit Lender's Lender Group at such time.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the indebtedness, obligation or any other liability of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the shares of any other Person. The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount (or maximum outstanding principal amount, if larger) of the debt, obligation or other liability guaranteed thereby.

"Converted REMIC Eligible Mortgage Loan" means, as of any date of determination, a Warehouse Asset that was at any time a Non-REMIC Eligible Mortgage Loan that subsequently qualifies as a REMIC Eligible Mortgage Loan by satisfying conditions (a), (b) and (c) of the definition thereof after its date of acquisition by any Seller.

"Credit Policy" means those underwriting and credit policies (including the Servicing Standards, as such term is defined in the Servicing and Custodian Agreement) of the Servicer and the Borrower with respect to the Warehouse Assets as described in Schedule 10.1.7 hereto, as amended from time to time in accordance with Section 10.1.7.

"Custodial Fees" means the fees payable to the Custodian by SNHC, as Seller, pursuant to Section 3.04(a) of the Servicing and Custodian Agreement.

"Custodian" means U.S. Bank National Association (successor to Wachovia Bank, National Association), in its capacity as Custodian under the Servicing and Custodian Agreement, together with its successors and permitted assigns.

"Default Rate" has the meaning set forth in Section 3.1(c).

"Defaulting Alternate Lender" has the meaning set forth in Section 2.3(f).

"Determination Date" means, with respect to a Distribution Date, the 10th day of the month in which such Distribution Date occurs, or if such day is not a Business Day, the next succeeding Business Day.

"Distribution Date" means the 15th day of each month or, if such day is not a Business Day, the next succeeding Business Day; *provided, however*, that on and after any Event of Default, the Distribution Date for purposes hereof shall occur on the last day of each Interest Period with respect to such Loans as such Interest Period may be selected by the Administrative Agent in accordance with the definition thereof.

"Dollar(s)" and the sign "$" shall mean lawful money of the United States of America.

"Downgrade Collateral Account" has the meaning set forth in Section 6.2.1.

"Downgrade Draw" has the meaning set forth in Section 6.2.1.

"Electronic Tracking Agreement" means that certain Electronic Tracking Agreement, dated as of the Closing Date, among Bank of America, as administrative agent, MERSCORP, Inc., Mortgage Electronic Registration Systems, Inc. and the Borrower.

"Eligible Investments" means, with respect to a Lender Group, highly rated short term debt or the other highly rated liquid investments in which the Conduit Lender in such Lender Group is permitted to invest cash pursuant to its commercial paper program documents.

"Eligible Warehouse Asset" means, on any date, each Warehouse Asset acquired by the Borrower pursuant to the Sale and Contribution Agreement and still owned by the Borrower on such date, and with respect to which each of the representations, warranties and statements set forth in Exhibit 1.1(a) hereto are true and correct in all respects on such date, as if made by the Borrower on such date.

"Environmental Laws" means all applicable Federal, state, and local laws, statutes, ordinances, rules, regulations and valid orders relating to the use, possession, handling, generation, transportation, treatment, storage, recycling, discharge, disposal, emission, presence, or Release, or the threat of Release of (collectively "Management"), or any remedial, removal or response action in connection with, any hazardous, toxic and polluting substances or wastes.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974 and any regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means an entity, whether or not incorporated, which is under common control with the Borrower, any Seller, the Servicer or SNHC within the meaning of Section 4001(a)(14) of ERISA, or is a member of a group which includes the Borrower, any Seller, the Servicer or SNHC and which is treated as a single employer under Sections 414(b), (c), (m), or (o) of the Code.

"ERV" means, at the time in question, the most recent estimated recovery value of each Warehouse Asset, as determined by the Servicer, as the servicer of such Warehouse Asset, (a) for REMIC Eligible Mortgage Loans and Converted REMIC Eligible Mortgage Loans, equal to the current unpaid principal balance of such Warehouse Assets, and (b) for Non-REMIC Eligible Mortgage Loans and REO Properties, on the basis of (i) performance, including any principal payments, and/or delinquency, and (ii) the BPO currently in effect therefor and otherwise in a manner which is (x) consistent with the past valuation and bidding practices of the Servicer, (y) no less comprehensive than industry standards and (z) reasonably acceptable to the Administrative Agent, provided, that the aggregate ERV for Non-REMIC Eligible Mortgage Loans shall be limited to 125% of the aggregate BPO values of such Mortgage Loans.

"ERV Ratio" means, the ratio, calculated on each Determination Date, expressed as a percentage (a) the numerator of which is the aggregate of all amounts received by the Servicer in connection with each mortgage loan and related property (including property acquired through foreclosure) that has been paid in full, sold, written-off, settled or otherwise disposed during the

preceding three calendar months, which amounts have been applied by the Servicer, in accordance with its customary collection practices, to the outstanding principal in respect of each such mortgage loan and/or related property during the period of time such mortgage loan and/or property has been in the Servicing Portfolio, and (b) the denominator of which is aggregate of the initial ERV (determined as of the date of acquisition thereof by the applicable Seller) for each such mortgage loan and/or related property.

"Estimated Recovery Value Percentage" means, each of the "Estimated Recovery Value Percentages" set forth opposite the applicable BPO on Exhibit 1.1(c) (as any such percentage may be reduced from time to time in the reasonable discretion of the Servicer with written notice to the Administrative Agent).

"Eurodollar Disruption Event" means, with respect to all Loans allocated to any Interest Period, any of the following: (a) a determination by the applicable Managing Agent or any Lender that it would be contrary to law or to the directive of any central bank or other governmental authority (whether or not having the force of law) to obtain United States Dollars in the London interbank market to make, fund or maintain any Loan (or portion thereof) for such Interest Period, (b) a Managing Agent is unable to obtain on a timely basis the information necessary to determine the Eurodollar Rate (Reserve Adjusted), (c) a determination by the applicable Managing Agent or any Lender that the rate at which deposits of United States Dollars are being offered to such Person in the London interbank market does not accurately reflect the cost to such Person of making, funding or maintaining any Loan for such Interest Period or (d) the inability of the applicable Managing Agent or any Lender to obtain United States Dollars in the London interbank market to make, fund or maintain any Loan (or portion thereof) for such Interest Period.

"Eurodollar Loan" shall mean any Loan (or portion thereof) that bears interest at the Eurodollar Rate (Reserve Adjusted).

"Eurodollar Rate (Reserve Adjusted)" means, with respect to any Loan (or portion thereof) for any Interest Period, a rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) determined pursuant to the following formula:

| Eurodollar Rate | = | Eurodollar Rate |
|---|---|---|
| (Reserve Adjusted) | | 1-Eurodollar |
| | | Reserve Percentage |

where:

"Eurodollar Rate" means, for such Interest Period:

(a)     the rate per annum (carried out to the fifth decimal place) equal to the rate determined by the Administrative Agent to be the offered rate that appears on the page of the Telerate Screen that displays an average British Bankers Association Interest Settlement Rate (such page currently being page number 3750) for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, or

(b)     in the event the rate referenced in the preceding subsection (a) does not appear on such page or service or such page or service shall cease to be available, the rate per annum (carried to the fifth decimal place) equal to the rate determined by the Administrative Agent to be the offered rate on such other page or other service that displays an average British Bankers Association Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, or

(c)     in the event the rates referenced in the preceding subsections (a) and (b) are not available, the rate per annum determined by the Administrative Agent as the rate of interest at which Dollar deposits (for delivery on the first day of such Interest Period) in same day funds in the approximate amount of the applicable Loan (or portion thereof) to be funded by reference to the Eurodollar Rate and with a term equivalent to such Interest Period would be offered by its London Branch to major banks in the offshore dollar market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period.

"Eurodollar Reserve Percentage" means, for any day during any Interest Period, the reserve percentage (expressed as a decimal, rounded upward to the next 1/100th of 1%) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the Board of Governors of the Federal Reserve System for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "eurocurrency liabilities"). The Eurodollar Rate shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

"Event of Bankruptcy" shall be deemed to have occurred with respect to a Person if either:

(a)     a case or other proceeding shall be commenced, without the application or consent of such Person, in any court, seeking the liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person or all or substantially all of its assets, or any similar action with respect to such Person under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of 60 consecutive days; or an order for relief in respect of such Person shall be entered in an involuntary case under the federal bankruptcy laws or other similar laws now or hereafter in effect; or

(b)     such Person shall commence a voluntary case or other proceeding under any applicable bankruptcy, insolvency, reorganization, debt arrangement, dissolution or other similar law now or hereafter in effect, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) for such Person or for any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall fail to, or admit in writing its inability to, pay its debts generally as

they become due, or, if a corporation or similar entity, its board of directors or board of managers shall vote to implement any of the foregoing.

"Event of Default" shall mean any of the events described in Section 11.1.

"Excess Concentration Amount" means, as of any date, an amount equal to the aggregate excess (if any) of (i) the outstanding Warehouse Asset Principal Balance of each Eligible Warehouse Asset subject to a Facility Sub-Limit, over (ii) the applicable Facility Sub-Limit.

"Excess Spread" means an amount, calculated on each Determination Date, equal to the positive difference, if any, between (a) all Collections received by the Borrower or the Servicer during the preceding month (other than any such Collections of the type described in clause (vii) of the definition thereof, received in respect of any applicable recourse or repurchase obligation by the applicable Seller under the Sale and Contribution Agreement, the Sale and Contribution Agreement (Middle Tier) or the Purchase and Sale Agreement), minus (b) the sum of (i) the Trustee Fees, the Servicing Fees, the Backup Servicing Fees, and all other Fees payable by the Borrower under this Agreement and the other Transaction Documents, accrued during such calendar month, plus (ii) all accrued and unpaid interest on the Loans during such calendar month, plus (iii) any other costs, expense, or liability of the Borrower of any nature whatsoever incurred during such period (other than any such obligations of the Borrower in respect of principal on the Loans).

"Excluded Taxes" has the meaning set forth in Section 7.3.

"Facility Limit" means, as of any date of determination, an amount equal to $255,000,000, as such amount may be reduced in accordance with Section 2.7 hereof; *provided* that such amount may not at any time exceed the aggregate of all Commitments then in effect.

"Facility Sub-Limits" shall be exceeded if, on any date of determination:

(a)     the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are Commercial Mortgage Loans exceeds the greater of (i) $40,000,000 and (ii) 20% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(b)     the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are Non-REMIC Eligible Loans exceeds the greater of (A) $100,000,000 and (B) 50% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(c)     the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are Residential Mortgage Loans with an outstanding principal balance in excess of $337,500 exceeds 5% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets that are Residential Mortgage Loans;

(d)     the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are both Non-REMIC Eligible Mortgage Loans and Commercial Mortgage Loans exceeds the greater of (A) $20,000,000 and (B) 10% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(e)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are secured by a second lien on the related Property exceeds the greater of (i) $60,000,000 and (ii) 30% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(f)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are Non-REMIC Eligible Mortgage Loans secured by a second lien on the related Property exceeds the greater of (A) $10,000,000 and (B) 5% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(g)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are Commercial Mortgage Loans secured by a second lien on the related Property exceeds the greater of (A) $10,000,000 and (B) 5% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(h)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are REO Properties exceeds $15,000,000;

(i)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that have related Property located in a single state exceeds 20% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(j)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets that are REMIC Eligible Mortgage Loans that have a Loan-to-Value Ratio in excess of 95% (or, in the case of Eligible Warehouse Assets secured by a second lien on the related Property, have a Combined Loan-to-Value Ratio in excess of 95%) exceeds the greater of (A) $60,000,000 and (B) 30% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(k)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets the Related Security with respect to which includes manufactured housing exceeds 5% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets;

(l)      any portion of the Adjusted Principal Balance for each Eligible Warehouse Asset that is a Commercial Mortgage Loan exceeds $2,000,000;

(m)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets the Related Security with respect to which consists of unimproved land exceeds 5% of the aggregate Adjusted Principal Balance of all Eligible Warehouse Assets; and

(n)      the aggregate Adjusted Principal Balance for all Eligible Warehouse Assets with respect to which an "Initial Custodian Certification" has not been delivered by the Custodian under the Servicing and Custodian Agreement exceeds $20,000,000.

"Federal Funds Rate" means for any day the rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that: (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding

Business Day as so published on the next succeeding Business Day; and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to the applicable Managing Agent on such day on such transactions as determined by the applicable Managing Agent.

"Fee Letter" has the meaning set forth in Section 3.3.

"Fees" means all fees and other amounts payable by Borrower pursuant to the Fee Letter.

"Financial Officer" has the meaning set forth in Section 10.1.9(a).

"Fiscal Quarter" means any quarter in a Fiscal Year.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31.

"Fixed Rate Mortgage Loan" means a Mortgage Loan as to which the related Mortgage Note provides for an interest rate that remains fixed throughout the term thereof.

"Forbearance Letter" means any letter delivered by the Borrower or any Affiliate thereof (including the Servicer) to any Obligor substantially in the form attached hereto as Exhibit 1.1(b).

"Funding Account" means the account maintained by Borrower for the purpose of receiving the proceeds of Loans hereunder, and the account information of such account is initially set forth in Schedule 15.3, under the heading "Funding Account Information for Borrower".

"GAAP" means generally accepted United States accounting principles.

"Governmental Authority" means any government or political subdivision or any agency, authority, bureau, central bank, commission, department or instrumentality of any such government or political subdivision, or any court, tribunal, grand jury or arbitrator, or any accounting board or authority (whether or not a part of government) which is responsible for the establishment or interpretation of national or international accounting principles, in each case whether foreign or domestic.

"Hazardous Discharge" has the meaning set forth in Section 10.1.14(e).

"Hazardous Materials" means any dangerous, toxic or hazardous pollutants, chemicals, contaminants, wastes, medical wastes, or substances, including, without limitation, those so identified pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., or any other federal, state or local environmental law or regulation now existing, and specifically including, without limitation, asbestos and asbestos containing materials, PCBs, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory," "usable work in process" or similar classification which would, if classified as unusable, be included in the foregoing definition.

"Hazardous Substances" has the meaning set forth in Section 9.20(d).

"Indebtedness" of any Person means, without duplication:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(b)     all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, and banker's acceptances issued for the account of such Person;

(c)     all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capitalized lease liabilities;

(d)     all other items that, in accordance with GAAP, would be included as liabilities on the liability side of the balance sheet of such Person as of the date at which Indebtedness is to be determined;

(e)     whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services, and indebtedness (excluding prepaid interest thereon) secured by a lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; and

(f)     all Contingent Liabilities of such Person in respect of any of the foregoing.

"Indemnified Amounts" has the meaning set forth in Section 14.1.

"Indemnified Party" has the meaning set forth in Section 14.1.

"Interest Component" means, with respect to a Conduit Lender, at any time of determination, the aggregate for all Related Commercial Paper of such Conduit Lender at such time of: (a) with respect to any Commercial Paper issued on an interest-bearing basis, the interest payable on such Commercial Paper at its maturity (including any dealer commissions); and (b) with respect to any Commercial Paper issued on a discount basis, the portion of the face amount of such Commercial Paper representing the discount incurred in respect thereof (including any dealer commissions).

"Interest Period" means, with respect to each Loan hereunder, initially, the period commencing on and including the date of such Loan and ending on and including the last day of the calendar month in which such Loan was made and thereafter, each period beginning with and including the first day after the last day of the immediately preceding Interest Period and ending on and including the last day of the current calendar month; *provided*, that

(A)     any Interest Period with respect to any Portion of Net Investment (other than any Portion of Net Investment accruing interest at the Commercial Paper Rate) which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day; *provided, however*, if interest in respect of such Interest Period is computed by

reference to the Eurodollar Rate, and such Interest Period would otherwise end on a day which is not a Business Day, and there is no subsequent Business Day in the same calendar month as such day, such Interest Period shall end on the next preceding Business Day;

(B)     in the case of any Interest Period for any Portion of Net Investment which commences before the Commitment Termination Date and would otherwise end on a date occurring after the Commitment Termination Date, such Interest Period shall end on such Commitment Termination Date and the duration of each Interest Period which commences on or after the Commitment Termination Date shall be of such duration as shall be selected by the Administrative Agent; and

(C)     any Interest Period in respect of which interest is computed by reference to the Commercial Paper Rate may be terminated at the election of the Administrative Agent any time, in which case the Portion of Net Investment allocated to such terminated Interest Period shall be allocated to a new Interest Period and shall accrue interest at the Alternate Rate;

*provided, further,* that on and after any Event of Default, the Interest Period, for purposes of determining payments of interest and principal on the Loans, shall be the period selected as such by and in the sole discretion of the Administrative Agent (including a period of one day) and in the absence of any such selection by the Administrative Agent shall remain the period determined according to this definition above.

"Interest Rate Agreement" means any interest rate hedge agreement, or similar type of transaction, however denominated, that may be entered into from time to time by the Borrower in connection with the hedging of its rights or obligations pursuant to this Agreement.

"Kitty Hawk" means Kitty Hawk Funding Corporation, a Delaware corporation.

"Kitty Hawk Alternate Lenders" means the Alternate Lenders in the Kitty Hawk Lender Group, as set forth on the signature pages hereto or the applicable Assignment Agreement.

"Kitty Hawk Lender Group" means Kitty Hawk, any permitted Conduit Assignee thereof administered by Bank of America or any of its Affiliates, the Kitty Hawk Alternate Lenders from time to time party hereto and Bank of America, as Managing Agent.

"Land Sale Contract" means, a contract for the sale of real property, sometimes referred to as a contract for deed, in which the seller under such contract retains record legal title to such property until such contract is paid in full by the buyer.

"Lender" means each Conduit Lender and Alternate Lender, as the context may require; and collectively, the "Lenders".

"Lender Group" means each of: (i) the Kitty Hawk Lender Group; and (ii) any other Lender Group from time to time party hereto.

"Lender Group Percentage" means, for any Lender Group, the percentage equivalent (carried out to five decimal places) of a fraction the numerator of which is the aggregate Net

Investment of all Lenders in such Lender Group and the denominator of which the aggregate Net Investment of all Lenders in all Lender Groups.

"Lender Party" has the meaning set forth in Section 12.1(a).

"Liquidated Warehouse Asset" means, at any time, a Warehouse Asset with respect to which the Servicer has determined, in accordance with the servicing procedures specified in the Servicing and Custodian Agreement, that all proceeds that it expects to recover from or on account of such Warehouse Asset have been recovered.

"Liquidity Agreement" means and includes, with respect to a Conduit Lender, any agreement entered into by any Liquidity Bank providing for the issuance of one or more letters of credit for the account of such Conduit Lender, the issuance of one or more surety bonds for which such Conduit Lender is obligated to reimburse the applicable Liquidity Bank for any drawings thereunder, the sale by such Conduit Lender to any Liquidity Bank of any interest in the Asset Interest (or portions thereof or participations therein) or the making of loans or other extensions of credit to such Conduit Lender in connection with such Conduit Lender's commercial paper program, together with any letter of credit, surety bond or other instrument issued thereunder.

"Liquidity Bank" means and includes, with respect to a Conduit Lender, any Person, now or hereafter extending credit or having a commitment to extend credit to or for the account of, or to make purchases from, such Conduit Lender or issuing a letter of credit, surety bond or other instrument to support any obligations arising under or in connection with such Conduit Lender's commercial paper program.

"Loan" means any amount disbursed as principal by the Administrative Agent (on behalf of the Lenders) to Borrower under this Agreement.

"Loan Date" has the meaning provided in Section 2.2.

"Loan-to-Value Ratio" means, as of any date of determination, with respect to any Warehouse Asset that is evidenced by a Land Sale Contract or that is secured by a Mortgage that is in the first lien on the related Property, the ratio of (i) the Warehouse Asset Principal Balance thereof, to (ii) the BPO on such date.

"Managing Agent" means, with respect to any Lender Group, the Person acting as Managing Agent therefor and designated as such on the signature pages hereto or in the assignment pursuant to which such Lender Group becomes a party hereto, and its successors and assigns.

"Market Value" means, with respect to any Warehouse Asset, the market value thereof as of any date as determined by the Administrative Agent using a valuation methodology generally accepted in the market and applied in its sole reasonable discretion.

"Master Lockbox" shall mean the post office box rented by Wells Fargo Bank, National Association in the Servicer's name for receipt of payments related to the mortgage and consumer

loans and REO Properties serviced by the Servicer, which is identified as follows: Dept 1710, Denver, CO 80291-1710.

"Master Lockbox Account" shall mean the deposit account established and maintained by the Servicer with Wells Fargo Bank, National Association, entitled "SN Servicing Corporation Lockbox Account", bearing account number 4121053573.

"Master Lockbox Arrangement" shall mean (a) the Servicer's or the Borrower's direction to the Obligors under any Mortgage Loan or other Collateral to remit payments directly to the Master Lockbox, and (b) the Servicer's or the Borrower's direction to the Master Lockbox Bank to deposit all payments in the Master Lockbox into the Master Lockbox Account on the same day it was received in the Master Lockbox (provided, that if a payment was received in the Master Lockbox on a day that is not a Business Day, such payment would be deposited into the Master Lockbox Account on the next Business Day).

"Master Lockbox Bank" shall mean Wells Fargo Bank, National Association.

"Material Adverse Effect" means, with respect to any event or circumstance, a material adverse effect on:

(a)     the business, assets, financial condition or operations of SNHC and its Subsidiaries, taken as a whole, the Servicer, or Borrower;

(b)     the ability of SNHC, the Servicer or Borrower to perform their respective obligations under this Agreement or any other Transaction Document;

(c)     the validity, enforceability or collectibility against Borrower, the Servicer or SNHC of this Agreement or any of the other Transaction Documents;

(d)     the status, existence, perfection or priority of (i) the Administrative Agent's security interest in the Collateral, or (ii) Borrower's ownership interest in the Warehouse Assets;

(e)     the validity, enforceability or collectibility of the Warehouse Assets; or

(f)     the ability of the Borrower (or any Affiliate thereof) to effect a Take-Out Securitization.

"Maximum Outstanding Principal Balance" means, at any time, an amount equal to the lesser of: (a) the quotient of the Facility Limit divided by 1.02; and (b) the Borrowing Base.

"Maximum Purchase Rate" means, at any time of determination, with respect to each Eligible Warehouse Asset:

(a)     For any Warehouse Asset that is a REMIC Eligible Mortgage Loan, 100%;

(b)     For any Warehouse Asset that is a Non-REMIC Eligible Mortgage Loan, 97%; and

      (c)     For any Warehouse Asset that is a Converted REMIC Eligible Mortgage Loan, 100%.

"MCBA" means modified cash basis method accounting as described in the audited financial statements of SNHC for the calendar year ended December 31, 2005 and as applied on an ongoing basis only as in effect on the date hereof.

"Monthly Pay Mortgage Loan" means a Mortgage Loan for which payments are scheduled to be paid on an a monthly basis.

"Monthly Report" has the meaning set forth in Section 10.1.9(c).

"Moody's" means Moody's Investors Service, Inc., or any successor or assignee of the business of such company in the business of rating securities.

"Mortgage" means the mortgage, deed of trust or other instrument creating a senior or junior lien on an estate in fee simple interest in real property.

"Mortgage Loan" means each loan or other provision of financing to an Obligor, evidenced by a Mortgage Note and secured by a Mortgage.

"Mortgage Loan Purchase Price" means, with respect to any Warehouse Asset (or, for purposes of the calculation of the Purchase Price Ratio, any mortgage loan in the Servicing Portfolio) as of any date of determination, the portion of the aggregate purchase price paid by the applicable Seller to acquire such Warehouse Asset or group of Warehouse Assets, allocated by the Servicer to such Warehouse Asset, in accordance with its standard allocation practices, as reduced by any collections received thereon as of such date and applied by the Servicer, in accordance with such standard allocation practices, in respect of the principal balance of such Warehouse Asset.

"Mortgage Note" means a promissory note or other evidence of debt of an Obligor secured by a Mortgage and evidencing a Mortgage Loan.

"Multiemployer Plan" is defined in Section 4001(a)(3) of ERISA.

"Net Investment" at any time means: (a) the sum of all Loans made to Borrower pursuant to Section 2.1 (together with the amount of any funding under a Liquidity Agreement allocated to the Interest Component at the time of such funding); less (b) the aggregate amount of payments and deposits theretofore received and applied by the Administrative Agent to reduce such Net Investment pursuant to Section 4.2; provided that the Net Investment shall be restored and reinstated in the amount of any payments or deposits so received and applied if at any time any such payment or deposit, or any related distribution, is rescinded or must otherwise be returned to the appropriate party for any reason; and provided further that Net Investment shall be increased by the amount described in the last sentence of Section 6.1.2 in the event that the Borrower does not make payment of assignment amounts as described therein. If the Net Investment hereunder is increased due to the funding of any Interest Component under a Liquidity Agreement, the applicable Administrator shall cause the applicable proceeds of such funding of the Interest Component to be invested in eligible investments under the applicable

conduit program documents until the maturity of the related Commercial Paper.  All proceeds of such investments shall be paid to the Borrower by the applicable Administrator (or otherwise credited against amounts payable by the Borrower).

"Net Spread Ratio" shall mean, for any calendar month (as determined as of the last day of each calendar month), the average for the last three (3) consecutive calendar months of the annualized percentage equivalent of a fraction (a) the numerator of which is equal to the Excess Spread for each such calendar month, and (b) the denominator of which is equal to the average Warehouse Asset Principal Balance of all Eligible Warehouse Assets during each such calendar month.

"Non-Defaulting Alternate Lender" has the meaning set forth in Section 2.3(f).

"Non-REMIC Eligible Mortgage Loan" means, as of any date of determination, a Mortgage Loan or REO Property that (a) is either a Residential Mortgage Loan or a Commercial Mortgage Loan secured by a first lien or second lien on the related Property or an REO Property; (b) is more than thirty (30) days delinquent with respect to any Scheduled Payment; and (c) the Obligor of which has not made at least three (3) of the last four (4) Scheduled Payments.

"Note" has the meaning set forth in Section 2.8.

"Obligations" means all obligations (monetary or otherwise) of Borrower to the Lenders, the Administrative Agent, the other Secured Parties and their respective successors, permitted transferees and assigns (including any Liquidity Bank or Program Support Provider), arising under or in connection with this Agreement, the Note and each other Transaction Document, in each case however created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"Obligor" means a Person obligated to make payments with respect to a Warehouse Asset.

"Occupy or Occupied" means to occupy a site or to have occupied a site in such fashion as would subject a Person to liability under the Environmental Laws for remediation of the site so occupied.

"Original Loan Agreement" has the meaning provided in the preamble.

"Other Borrower" means, with respect to a Conduit Lender, any Person other than Borrower that has entered into a purchase agreement with respect to receivables, loans, investments or other financial assets or a loan or security agreement, note purchase agreement, transfer and administration agreement or any other similar agreement with such Conduit Lender.

"Pension Plan" means an employee pension benefit plan as defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA (other than a Multiemployer Plan) and to which SNHC, any Seller, the Servicer, the Borrower or an ERISA Affiliate thereof may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Performance Guaranty" means that certain Amended and Restated Performance Guaranty made as of the date hereof by SNHC in favor of the Administrative Agent (for the benefit of the Secured Parties).

"Permitted Investments" shall mean any of the following (a) negotiable instruments or securities represented by instruments in bearer or registered or in book-entry form which evidence (i) obligations fully guaranteed by the United States of America or any agency of the United States of America; (ii) obligations of any agency of the United States of America; (iii) time deposits in, or bankers acceptances issued by, any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by Federal or state banking or depositary institution authorities; *provided, however,* that at the time of investment or contractual commitment to invest therein, the certificates of deposit or short-term deposits, if any, or long-term unsecured debt obligations (other than such obligation whose rating is based on collateral or on the credit of a Person other than such institution or trust company) of such depositary institution or trust company shall have a credit rating from Moody's and Standard & Poor's of at least P-1 and A-1, respectively, in the case of the certificates of deposit or short-term deposits, or a rating not lower than one of the two highest investment categories granted by Moody's and by Standard & Poor's; (iv) certificates of deposit having, at the time of investment or contractual commitment to invest therein, a rating from Moody's and Standard & Poor's of at least P-1 and A-1, respectively; or (v) investments in money market funds rated in the highest investment category or otherwise approved in writing by Moody's and Standard & Poor's; (b) demand deposits and cash escrows in any depositary institution or trust company referred to in (a)(iii) above; (c) commercial paper (having original or remaining maturities of no more than 30 days) having, at the time of investment or contractual commitment to invest therein, a credit rating from Moody's and Standard & Poor's of at least P-1 and A-1, respectively; (d) Eurodollar time deposits having a credit rating from Moody's and Standard & Poor's of at least P-1 and A-1, respectively; (e) repurchase agreements involving any of the Permitted Investments described in clauses (a)(i), (ii), (a)(iv) and (d) of this definition so long as the other party to the repurchase agreement has at the time of investment therein, a rating from Moody's and Standard & Poor's of at least P-1 and A-1, respectively; and (f) any other investment permitted by the Administrative Agent.

"Permitted Liens" means (a) liens for real estate taxes and other charges imposed by any Governmental Authority not yet due or delinquent, (b) title and survey exceptions as the Administrative Agent may approve, (c) rights of existing and future tenants under leases approved in accordance with any Credit Policy (provided that all such approved leases are subordinate to the lien of the Security Agreement), (d) liens for the performance of work or the supply of materials in the event that the Borrower or the applicable Obligor discharges such lien by payment or bonding on or prior to the date that is the earlier of (i) forty-five (45) days after the date of filing of any such lien and (ii) the date on which the subject premises is subject to a levy, execution, attachment or sequestration, and (e) first liens on the related Property of a REMIC Eligible Mortgage Loan, Converted REMIC Eligible Mortgage Loan or a Non-REMIC Eligible Mortgage Loan, in each case that were existing and in effect on the date that the funds associated with the applicable Warehouse Asset were disbursed to the related Obligor.

"Person" means an individual, partnership, corporation (including a statutory or business trust), joint stock company, limited liability company, trust, unincorporated association, joint venture, government or any agency or political subdivision thereof or any other entity.

"Portion of Net Investment" has the meaning set forth in Section 3.1(e).

"Pro Rata Share" means, for an Alternate Lender with respect to a Lender Group, the Commitment of such Alternate Lender in such Lender Group, *divided by* the sum of the Commitments of all Alternate Lenders in such Lender Group or, if the Commitments shall have been terminated, its *pro rata* share as calculated immediately prior to the termination of such Commitments.

"Program Fee" means the program fee rate payable pursuant to the Fee Letter.

"Program Support Provider" means, any bank or other financial institution which provides credit support to a Conduit Lender in connection with its commercial paper and/or secured liquidity note securitization program.

"Property" means, with respect to any Warehouse Asset, the related real property, including any improvements thereon.

"Purchase and Sale Agreement" means, collectively, the Purchase and Sale Agreement, dated as of the date hereof, between each of the Sellers party thereto and SNHC, as buyer, and any Sale and Assignment Agreement between Security National Funding Trust, as seller, and SNHC, as buyer.

"Purchase and Sale Termination Event" means an event of default, termination or similar event under the Sale and Contribution Agreement, the Sale and Contribution Agreement (Middle Tier) and/or the Purchase and Sale Agreement, as applicable, in either case, however defined.

"Purchase Price Ratio" means the ratio, calculated on each Determination Date, expressed as a percentage (a) the numerator of which is the aggregate of all amounts received by the Servicer in connection with each mortgage loan and related property (including property acquired through foreclosure) in the Servicing Portfolio that has been paid in full, sold, written-off, settled or otherwise disposed during the preceding three calendar months, which amounts have been applied by the Servicer, in accordance with its customary collection practices, to the outstanding principal in respect of each such mortgage loan and/or related property during the period of time such mortgage loan and/or property has been in the Servicing Portfolio, and (b) the denominator of which is the aggregate of the initial Mortgage Loan Purchase Price (determined as of the date of acquisition thereof by the applicable Seller) for each such mortgage loan and/or related property.

"Purchased REO Property" means any Property, title to which was acquired through a foreclosure, deed-in-lieu of foreclosure or otherwise, and which Property is sold, transferred or otherwise assigned (a) from the applicable Seller thereof to SNHC, pursuant to the Purchase and Sale Agreement, (b) from SNHC to SNBOA, LLC, pursuant to the Sale and Contribution Agreement (Middle Tier), and (c) from SNBOA, LLC to the Borrower pursuant to the Sale and Contribution Agreement, as applicable.

"Rate Types" means the Commercial Paper Rate, the Alternate Rate or the Default Rate.

"Rating Agencies" means Standard & Poor's and Moody's.

"Related Commercial Paper" means, with respect to a Conduit Lender, at any time of determination, Commercial Paper of such Conduit Lender the proceeds of which are then allocated by the Administrator of such Conduit Lender as the source of funding the acquisition or maintenance of its interest in the Asset Interest.

"Related Security" means, with respect to any Warehouse Asset, all of the Borrower's and/or the applicable Seller's right, title, interests and remedies in, to and under the related Mortgage Note, the related Warehouse Asset File (and all documents, instruments and other items therein), the related Mortgage, the related Property, any applicable Interest Rate Agreement covering the portfolio of Warehouse Assets of which the applicable Warehouse Asset is included, the Purchase and Sale Agreement, the Sale and Contribution Agreement (Middle Tier), the Sale and Contribution Agreement, the Servicing and Custodian Agreement, the related accounts (including the Collection Account, the Spread Account and the Master Lockbox Account) and the Master Lockbox, the Security Agreement, the Performance Guaranty, and all proceeds of the foregoing, including, without limitation, (i) the right of the Borrower and/or the applicable Seller to receive all scheduled and unscheduled payments of principal and interest and all other amounts payable in connection with the related Warehouse Asset, (ii) the right of the Borrower and/or the applicable Seller to receive all insurance proceeds and condemnation awards that may be payable in respect of the related Property or Mortgage Note, (iii) the right, if any, of the Borrower and/or the applicable Seller to cause the related Seller to repurchase the related Warehouse Asset or applicable Property and to receive the purchase price to be paid by the related Seller, (iv) the right to enforce the Borrower's and/or the applicable Seller's rights and remedies under and pursuant to the Servicing and Custodian Agreement and the related purchase and sale, transfer or other applicable assignment agreement (including the Purchase and Sale Agreement, the Sale and Contribution Agreement (Middle Tier) and the Sale and Contribution Agreement), if any, with respect thereto, (v) the rights and remedies of the Borrower under the Performance Guaranty, (vi) all security interests or liens and property subject thereto from time to time purporting to secure any of the foregoing rights or interests, and the right to all collections in respect thereof, (vii) all guarantees, all title, casualty and other insurance policies (including, without limitation, the right to receive all return premiums related thereto) and other agreements or arrangements of whatever character from time to time supporting or securing or otherwise related to the related Mortgage, the related Property and/or the related Mortgage Note, (viii) all Collections and all accounts to which Collections in respect of any Warehouse Assets and/or Property are deposited (including the Collection Account, the Spread Account and the Master Lockbox Account), (ix) all other information, documents, instruments, servicing files, records and computer-readable media, personal property, contract rights, servicing rights, escrow funds, impound accounts and general intangibles of whatsoever kind evidencing, comprising or relating to the ownership or transfer of such Warehouse Asset and/or Property or the servicing thereof and all other documents or instruments delivered to the Borrower, the applicable Seller, the Servicer and/or the Custodian with respect thereto and (x) all proceeds of the foregoing.

"Release" has the meaning set forth in Section 9.20(f).

"REMIC" means a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"REMIC Eligible Mortgage Loan" means, as of any date of determination, a Mortgage Loan that (a) is a Residential Mortgage Loan or a Commercial Mortgage Loan secured by a first or second lien in the related Property; (b) meets all of the REMIC eligibility criteria on Exhibit 1.1(a)-4; (c) the Obligor of which (i) has made at least three (3) of the last four (4) Scheduled Payments, or (ii) is contractually current as of the latest due date on the related Mortgage Note (or is not more than 30 days delinquent with respect to any Scheduled Payment); and (d) is not a Converted REMIC Eligible Mortgage Loan.

"Renewal Response Date" has the meaning set forth in Section 6.3.1.

"REO Property" means (i) any Property acquired in the name of the Borrower through foreclosure, deed-in-lieu of foreclosure or otherwise with respect to a Mortgage Loan and (ii) any Purchased REO Property.

"Required Downgrade Assignment Period" has the meaning set forth in Section 6.2.1.

"Required Lenders" means, at any time, the Administrative Agent and those Alternate Lenders that hold Commitments aggregating in excess of fifty percent (50%) of the Facility Limit as of such date (or, if the Commitments shall have been terminated, the Administrative Agent and those Alternate Lenders whose aggregate Net Investment exceed fifty percent (50%) of aggregate Net Investment of all Lenders).

"Requirement of Law" means, as to any Person, the articles or certificate of incorporation or association and by-laws or other organizational or governing documents of such Person, and any law (including common law), constitution, statute, treaty, rule, regulation, ordinance, order, injunction, writ, decree, non-appealable judgment or award of any Governmental Authority, in each case applicable to or binding upon such Person or to which any of its material property is subject.

"Residential Mortgage Loan" means a Mortgage Loan secured by a Mortgage on one-to-four unit residential properties.

"Sale and Contribution Agreement" means the Amended and Restated Sale and Contribution Agreement, dated as of the date hereof, between SNBOA, LLC, as Seller, and the Borrower.

"Sale and Contribution Agreement (Middle Tier)" means the Sale and Contribution Agreement, dated as of the date hereof, between SNHC, as seller and SNBOA, LLC, as buyer.

"Schedule of Warehouse Assets" means a schedule or report attached to or accompanying a Borrowing Request, setting forth, at a minimum, the following information: (a) with respect to each Warehouse Asset, (i) the applicable Seller's identifying number; (ii) the Obligor's name; (iii) the type of Warehouse Asset (i.e., REMIC Eligible Mortgage Loan, Converted REMIC Eligible Mortgage Loan or Non-REMIC Eligible Mortgage Loan); (iv) the Warehouse Asset Principal Balance with respect thereto as of the close of business on the date of such Borrowing

Request; and (v) the state where the related Property is located, and (b) with respect to the Warehouse Assets in the aggregate (i) the number of Warehouse Assets owned by the Borrower at such time, and (ii) the aggregate Warehouse Asset Principal Balance of all Warehouse Assets at such time, as such schedule may be amended, updated, supplemented or otherwise modified from time to time.

"Scheduled Commitment Termination Date" means November 19, 2007 (without giving effect to any acceleration thereof pursuant to Section 11.2).

"Scheduled Payment" means any regularly scheduled payment of principal and interest, or interest only, required under a Mortgage Note related to a Warehouse Asset.

"Secured Parties" has the meaning set forth in the Security Agreement.

"Security Agreement" means that certain Amended and Restated Security Agreement, dated as of the date hereof, between the Borrower and the Administrative Agent.

"Seller" means (a) SNHC, as "Seller" under the Sale and Contribution Agreement (Middle Tier), (b) SNBOA, LLC, as "Seller" under the Sale and Contribution Agreement, and (c) each Person from time to time party to the Purchase and Sale Agreement, as a "Seller".

"Servicer" means SN Servicing Corporation, in its capacity as Servicer under the Servicing and Custodian Agreement, and any successor thereto in such capacity.

"Servicer Default" has the meaning set forth in Section 5.01(a) of the Servicing and Custodian Agreement.

"Servicing Advances" has the meaning set forth in Section 4.07(b) of the Servicing and Custodian Agreement.

"Servicing and Custodian Agreement" means the Amended and Restated Servicing and Custodian Agreement, dated as of July 29, 2005, among SNBOA, LLC, as Second Tier Seller, the Borrower, the Servicer, the Administrative Agent, the Custodian and the Backup Servicer, as Backup Servicer with respect to the Residential Mortgage Loans, as amended from time to time.

"Servicing Fee" has the meaning set forth in the Servicing and Custodian Agreement and includes (without duplication) any amounts payable to the Servicer, in its capacity as administrator for the Borrower under the Administration Agreement.

"Servicing Portfolio" means, as of any date, all mortgage loans and related properties (including such property acquired through foreclosure), whether or not thereafter sold or disposed of, which are serviced by the Servicer or any of its Affiliates at such time on behalf of each of the entities listed on Schedule 1.1(a) hereto (as such schedule may be amended, supplemented, updated or otherwise modified from time to time with the prior written consent of the Administrative Agent).

"SNHC" means Security National Holding Company, LLC.

"SN Party" has the meaning set forth in Section 10.1.8.

"Spread Account" has the meaning set forth in Section 4.3(a).

"Spread Account Agreement" means the control, blocked account or similar agreement dated as of the Closing Date (in form and substance reasonably acceptable to the Administrative Agent), among the Borrower, the Servicer, the Administrative Agent and the Spread Account Bank.

"Spread Account Bank" means Wells Fargo Bank, NA, as the bank at which the Spread Account is maintained.

"Standard & Poor's" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor or assignee of the business of such division in the business of rating securities.

"Stated Maturity Date" means, with respect to all Loans outstanding, November 19, 2009, as such date may be accelerated pursuant to Section 11.2.

"Subsidiary" means, as to any Person: (a) any corporation at least fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries; and (b) any partnership, association, joint venture or other entity in which such person directly or indirectly through Subsidiaries has at least a fifty percent (50%) equity interest at any time.

"Take-Out Securitization" means any asset securitization, secured loan, whole-loan sale or similar transaction involving the Warehouse Assets (other than one pursuant to the Transaction Documents).

"Transaction Documents" means this Agreement, the Sale and Contribution Agreement, the Sale and Contribution Agreement (Middle Tier), the Purchase and Sale Agreement, the Note, the Fee Letter, the Security Agreement, the Servicing and Custodian Agreement, the Performance Guaranty, the Trust Agreement, the Administration Agreement, any applicable Interest Rate Agreement, the Collection Account Agreement, the Spread Account Agreement, the Electronic Tracking Agreement, and the other instruments, certificates, agreements, reports and documents to be executed and delivered under or in connection with any such agreement, as any of the foregoing may be amended, supplemented, amended and restated, or otherwise modified from time to time.

"Trust Agreement" means the Second Amended and Restated Trust Agreement, dated as of the date hereof, between the Trustee and SNBOA, LLC, as the holder of the beneficial interests in the Borrower.

"Trustee" means U.S. Bank Trust National Association, not in its individual capacity, but solely as trustee on behalf of the Borrower pursuant to the Trust Agreement.

"Trustee Fees" means the fees, set forth in a separate fee letter agreement dated as of the date hereof between the Trustee and SNBOA, LLC, as beneficial owner of the Borrower (as such agreement may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Administrative Agent), and payable to the Trustee pursuant to Section 6.01(a) of the Trust Agreement and Section 4.2 hereof.

"Type" means each separate category of Mortgage Loan specified in the definition of "Advance Rate" as having a distinct Advance Rate percentage.

"UCC" means the Uniform Commercial Code as from time to time in effect in the applicable jurisdiction or jurisdictions.

"USA Patriot Act" means the USA Patriot Act of 2001 (31 U.S.C. § 5318).

"Unmatured Event of Default" shall mean any event that, if it continues uncured, will, with lapse of time or notice or lapse of time and notice, constitute an Event of Default.

"Warehouse Asset" means each Mortgage Loan and each REO Property, together with all Related Security with respect thereto and all related items in the Warehouse Asset File and all other rights, benefits and proceeds arising in connection therewith.

"Warehouse Asset File" means, in respect of any Warehouse Asset, as applicable, the documents listed in Section 3.01(a) of the Servicing and Custodian Agreement.

"Warehouse Asset Principal Balance" means, on any date of determination, with respect to any Warehouse Asset, the lesser of (a) the outstanding principal amount due under the related Mortgage Note as of the date of acquisition thereof (as such terms may be modified in accordance with any applicable Forbearance Letter), less any payments received in respect of such Warehouse Asset as of such date and allocated to reduce the principal balance thereof in accordance with the terms of the related Mortgage Note and (b) the applicable Mortgage Loan Purchase Price therefor, at such time; *provided that*, the Warehouse Asset Principal Balance for any Warehouse Asset which has become a Liquidated Warehouse Asset shall be zero following the date on which such Warehouse Asset becomes a Liquidated Warehouse Asset, and at all times thereafter.

SECTION 1.2  Other Definitional Provisions.

(a)     Unless otherwise specified therein, all terms defined in this Agreement have the meanings as so defined herein when used in the Note or any other Transaction Document, certificate, report or other document made or delivered pursuant hereto.

(b)     Each term defined in the singular form in Section 1.1 or elsewhere in this Agreement shall mean the plural thereof when the plural form of such term is used in this Agreement, the Note or any other Transaction Document, certificate, report or other document made or delivered pursuant hereto, and each term defined in the plural form in Section 1.1 shall mean the singular thereof when the singular form of such term is used herein or therein.

(c)     The words "hereof," "herein," "hereunder" and similar terms when used in this Agreement shall refer to this agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references herein are references to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified.

(d)     For purposes of this Agreement and all certificates and other documents delivered pursuant thereto, unless the context otherwise requires: (a) references to any amount as on deposit or outstanding on any particular date means such amount at the close of business on such day; (b) the term "including" means "including without limitation"; (c) references to any law refer to that law as amended from time to time and include any successor law; (d) references to any agreement refer to that agreement as from time to time amended or supplemented or as the terms of such agreement are waived or modified in accordance with its terms; and (e) references to any Person include that Person's successors and permitted assigns.

SECTION 1.3  Other Terms.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.  All terms used in Article 9 of the UCC in the State of New York, and not specifically defined herein, are used herein as defined in such Article 9.

SECTION 1.4  Computation of Time Periods.  Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

## ARTICLE II

## THE COMMITMENT, BORROWING PROCEDURES AND NOTE

SECTION 2.1  Commitment to Lend.  (a)  On the terms and subject to the conditions set forth in this Agreement, including but not limited to Section 8.2, the Administrative Agent (on behalf of the Conduit Lenders or the Alternate Lenders as determined by Section 2.3) agrees to make Loans to Borrower on a revolving basis from time to time before the Commitment Termination Date in such amounts as may be from time to time requested by Borrower pursuant to Section 2.2; provided, however, that the aggregate principal amount of all Loans from time to time outstanding hereunder shall not exceed the Maximum Outstanding Principal Balance.

(b)     Asset Interest.  The Administrative Agent shall hold the Asset Interest on behalf of each Lender Group in accordance with the respective portions of the Net Investment funded by such Lender Group from time to time.  Within each Lender Group, the Administrative Agent shall hold the applicable Lender Group Percentage of the Asset Interest on behalf of the Lenders in that Lender Group pro rata in accordance with their respective outstanding portions of the Net Investment funded by them.

SECTION 2.2  Borrowing Procedures.  Borrower may request a Loan hereunder by giving notice to the Administrative Agent of a proposed borrowing not later than 11:00 a.m. (New York City time), three (3) Business Days prior to the proposed date of such borrowing. Each such notice (herein called a "Borrowing Request") shall be in the form of Exhibit 2.2 and

shall specify: (i) the desired amount of such Loan, which shall be at least $250,000 and in integral multiples of $100,000 in excess thereof; (ii) the desired date of such Loan (the "Loan Date"), which shall be a Business Day; (iii) certification that Borrower has complied in all respects with Article VIII, or, to the extent applicable, will comply as of the Loan Date; and (iv) such other information as is required by the form of such Borrowing Request. No Borrowing Request shall be valid hereunder for any purpose unless it shall have been accompanied or preceded by: (A) a Borrowing Base Certificate dated the date of such Borrowing Request; and (B) such documents as are required to satisfy any applicable conditions precedent as provided in Section 8.2.2. All Loans hereunder shall be made by each Lender Group on a pro rata basis (based on the aggregate Commitments of the Alternate Lenders in such Lender Group as a percentage of the aggregate Commitments of all Lenders hereunder).

SECTION 2.3 Conduit Lender Acceptance or Rejection; Borrowing Request Irrevocable.

(a) Notification of Conduit Lender. The Administrative Agent will promptly notify each Managing Agent of Administrative Agent's receipt of any Borrowing Request. If the Borrowing Request is received prior to the Conduit Investment Termination Date for a Conduit Lender, such Conduit Lender (or its Administrator on its behalf) shall instruct the Administrative Agent to accept or reject such Borrowing Request by notice given to Borrower and the Administrative Agent by telephone or facsimile by no later than the close of its business on the Business Day following its receipt of any such Borrowing Request.

(b) Borrowing Request Irrevocable. Each Borrowing Request completed and signed by Borrower in accordance with Section 2.2 shall be irrevocable and binding on Borrower, and . Borrower shall indemnify each Lender against any loss or expense incurred by such Lender, either directly or indirectly (including, in the case of any Conduit Lender, through a Liquidity Agreement) as a result of any failure by Borrower to complete such Loan, including any loss (including loss of profit) or expense reasonably incurred by the Administrative Agent or any Lender, either directly or indirectly (including, in the case of any Conduit Lender, pursuant to a Liquidity Agreement) by reason of the liquidation or reemployment of funds acquired by such Lender (or the applicable Liquidity Bank(s)) (including funds obtained by issuing Commercial Paper or obtaining deposits or loans from third parties) in order to fund such Loan.

(c) Alternate Lender's Commitment. At no time will any Conduit Lender have any obligation to fund a Loan. At all times on and after the Conduit Investment Termination Date for a Conduit Lender, all Loans shall be made by the Alternate Lenders of the related Lender Group. At any time when a Conduit Lender has rejected a request for Loan, the related Managing Agent shall so notify the related Alternate Lenders and such Alternate Lenders shall make such Loan, on a pro rata basis, in accordance with their respective Pro Rata Shares. Notwithstanding anything contained in this Section 2.3(c) or elsewhere in this Agreement to the contrary, no Alternate Lender shall be obligated to provide the Administrative Agent or Borrower with funds in connection with a Loan in an amount that would result in the portion of the aggregate Net Investment then funded by it exceeding its Commitment then in effect (minus the unrecovered principal amount of such Alternate Lender's investments in the Asset Interest pursuant to the Liquidity Agreement to which it is a party). The obligation of each Alternate Lender to remit its Pro Rata Share of any such Loan requested of its Lender Group shall be several from that of each

other Alternate Lender, and the failure of any Alternate Lender to so make such amount available to Administrative Agent shall not relieve any other Alternate Lender of its obligation hereunder.

(d)     Payment of Loan. On any Loan Date, each Conduit Lender or each Alternate Lender, as the case may be, shall remit its share of the aggregate amount of such Loan to the Funding Account (or such other account specified therefor from time to time by the Administrative Agent at the direction of the Borrower), by wire transfer of same day funds.

(e)     Managing Agents May Advance Funds. Unless a Managing Agent shall have received notice from any Lender that such Person will not make its share of any Loan available on the applicable Loan Date therefor (for purposes of this paragraph only, the "Loan Amount"), such Managing Agent may (but shall have no obligation to) make any such Lender's share of any such Loan available to Borrower in anticipation of the receipt by such Managing Agent of such Loan Amount from the applicable Lender. To the extent any such Lender fails to remit such Loan Amount to such Managing Agent after any such advance by such Managing Agent on such Loan Date, such Lender shall be required to pay such Loan Amount for its own account, together with interest thereon at a *per annum* rate equal to the Federal Funds Rate to such Managing Agent upon its demand therefor (*provided* that a Conduit Lender shall have no obligation to pay such interest amounts except to the extent that it shall have sufficient funds to pay the face amount of its Commercial Paper in full). If such Lender does not pay such Loan Amount together with such interest, such Managing Agent will promptly notify Borrower, and Borrower shall immediately pay such Loan Amount to the Administrative Agent (for distribution to the applicable Managing Agent), together with interest thereon from the applicable Loan Date through the date such Loan Amount is repaid to the Administrative Agent. Until such amount shall be repaid, such amount shall be deemed to be Net Investment paid by the applicable Managing Agent and such Managing Agent shall be deemed to be the owner of an interest in the Asset Interest hereunder to the extent of such Loan. Upon the payment of such amount to the Administrative Agent by such Lender, such payment shall constitute such Person's payment of its share of the applicable Loan.

(f)     Defaulting Alternate Lender. If, by 2:00 p.m. (New York City time) on any Loan Date or Assignment Date, whether or not any Managing Agent has advanced the amount of the applicable Loan, one or more Alternate Lenders in a Lender Group (each, a "Defaulting Alternate Lender", and each Alternate Lender other than any Defaulting Alternate Lender being referred to as a "Non-Defaulting Alternate Lender") fails to make its Pro Rata Share of any Loan available to the Administrative Agent pursuant to Section 2.3(d) or any Assignment Amount payable by it pursuant to Section 6.1.1 (the aggregate amount not so made available to Administrative Agent being called in either case the "Loan Deficit"), then such Alternate Lender's Managing Agent shall, by no later than 2:30 p.m. (New York City time) on the applicable Loan Date or the applicable Assignment Date, as the case may be, instruct each Non-Defaulting Alternate Lender in such Lender Group to pay, by no later than 3:00 p.m. (New York City time) on such date, in immediately available funds, to the Funding Account, an amount equal to the lesser of: (i) such Non-Defaulting Alternate Lender's proportionate share (based upon the relative Commitments of the Non-Defaulting Alternate Lenders) of the Loan Deficit with respect to such Lender Group; and (ii) its unused Commitment. A Defaulting Alternate Lender shall forthwith, upon demand, pay to the related Managing Agent for the ratable benefit of the Non-Defaulting Alternate Lenders all amounts paid by each

Non-Defaulting Alternate Lender on behalf of such Defaulting Alternate Lender, together with interest thereon, for each day from the date a payment was made by a Non-Defaulting Alternate Lender until the date such Non-Defaulting Alternate Lender has been paid such amounts in full, at a rate *per annum* equal to the sum of the Base Rate *plus* 2.00% *per annum*. In addition, if, after giving effect to the provisions of the immediately preceding sentence, any Loan Deficit with respect to any Assignment Amount continues to exist, each such Defaulting Alternate Lender shall pay interest to the related Managing Agent, for the account of the related Conduit Lender, on such Defaulting Alternate Lender's portion of such remaining Loan Deficit, at a rate *per annum*, equal to the sum of the Base Rate, *plus* 2.00% *per annum*, for each day from the applicable Assignment Date until the date such Defaulting Alternate Lender shall pay its portion of such remaining Loan Deficit in full to such Conduit Lender.

SECTION 2.4  Right to Replace Defaulting Alternate Lender.  Borrower may arrange for an assignment to one or more financial institutions, in accordance with Section 13.2, of all of the rights and obligations hereunder of each Alternate Lender that is designated as a Defaulting Alternate Lender pursuant to Section 2.3(f) and that, on the date of such assignment, continues to be a Defaulting Alternate Lender.  Any such assignment shall become effective on the date thereof, and each such Defaulting Alternate Lender shall cooperate fully with Borrower in effectuating any such assignment.

SECTION 2.5  Representation and Warranty.  Each request for a borrowing pursuant to Section 2.2 shall automatically constitute a representation and warranty by Borrower to the Agents and the Lenders that on the requested date of such borrowing, (a) the representations and warranties contained in Article IX will be true and correct as of such requested date as though made on such date, (b) no Event of Default or Unmatured Event of Default has occurred and is continuing or will result from the making of such borrowing, (c) the proposed borrowing will not result in a Borrowing Base Deficit after giving effect thereto, and (d) after giving effect to such requested borrowing, the conditions set forth in Section 2.1 and Article VIII with respect to such Loan are satisfied.

SECTION 2.6  [Reserved].

SECTION 2.7  Voluntary Termination of Commitments; Reduction of Facility Limit. Borrower may, in its sole discretion for any reason upon at least sixty (60) days' prior written notice to the Administrative Agent (with a copy to each Lender), terminate the Commitments in whole or reduce in part the unused portion of the Facility Limit; *provided, however,* that (a) each such partial reduction will be in a minimum amount of $5,000,000 or a higher integral multiple of $1,000,000, (b) in the event of a partial reduction and after giving effect to any such partial reduction, the remaining Facility Limit will not be less than $150,000,000, and (c) in connection therewith Borrower complies with Section 4.1(b).  All reductions in Commitments shall be pro rata across the Lender Groups.

SECTION 2.8  Note.  Borrower's obligation to pay the principal of and interest on the Net Investment hereunder shall be evidenced by a single note (the "Note") made by Borrower. The Note shall be:  (a) dated the date hereof; (b) denominated in a maximum principal amount equal to the Facility Limit; (c) payable to the order of the Administrative Agent on behalf of the Lenders; (d) otherwise substantially in the form of Exhibit 2.8 to this Agreement, with blanks

appropriately completed in conformity herewith; and (e) replace and supersede the note that was executed by the Borrower in connection with the Original Loan Agreement. The Administrative Agent shall, and is hereby authorized to, make a notation on the schedule attached to the Note of the date and the amount of each Loan and the date and amount of each payment of principal thereon, and prior to any transfer of the Note, the Administrative Agent shall endorse the outstanding principal amount of the Note on the schedule attached thereto; *provided, however,* that failure to make such notation shall not limit or otherwise affect the obligation of Borrower hereunder or under such Note to pay when due the Net Investment (as adjusted from time to time in accordance herewith), and to pay interest on the Net Investment (as so adjusted) and to pay any other amount owing hereunder or thereunder, in each case as provided herein.

## ARTICLE III

### INTEREST, FEES, ETC.

SECTION 3.1 <u>Interest Rates</u>. Borrower hereby promises to pay interest on the Net Investment (or each portion thereof) for the period commencing on the date thereof until paid in full, as follows:

(a)     for any Portion of Net Investment for any Lender Group that is funded by the issuance of Commercial Paper, during each Interest Period for such Portion of Net Investment, at a rate <u>per annum</u> equal to the Commercial Paper Rate applicable to such Interest Period;

(b)     for any Portion of Net Investment for any Lender Group that is funded other than by the issuance of Commercial Paper, during each Interest Period for such Portion of Net Investment, at a rate <u>per annum</u> equal to the Alternate Rate applicable to such Interest Period; and

(c)     notwithstanding the provisions of the preceding <u>clauses (a)</u> and <u>(b)</u>, following the occurrence of an Event of Default, at a rate <u>per annum</u> (the "<u>Default Rate</u>") equal to the Base Rate applicable to such Interest Period (but not less than the interest rate in effect for such Loan as at the date of such Event of Default), <u>plus</u> a margin of 2%.

(d)     After the date any principal amount of any Loan is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) or after any other monetary Obligation of Borrower arising under this Agreement shall become due and payable, Borrower shall pay (to the extent permitted by law, if in respect of any unpaid amounts representing interest), interest (after as well as before judgment) on such amounts at a rate <u>per annum</u> equal to the Base Rate plus a margin of 2%. No provision of this Agreement or the Note shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable law.

(e)     The Net Investment with respect to each Lender Group shall be allocated to tranches (each a "<u>Portion of Net Investment</u>") having Interest Periods and accruing interest at the Rate Types specified and determined in accordance with this <u>Section 3.1</u>. Any Portion of Net Investment funded by a Conduit Lender may from time to time be funded through the issuance of Commercial Paper or pursuant to a Liquidity Agreement, in the sole discretion of such Conduit Lender. At any time, each Portion of Net Investment shall have only one Interest Period and one

Rate Type. The aggregate Portions of Net Investment of each Lender Group at all times shall be equal to the Net Investment of such Lender Group, and at any time when the Net Investment is not divided into two or more portions, the term "Portion of Net Investment" shall mean 100% of the Net Investment of such Lender Group.

SECTION 3.2  Interest Payment Dates.  Interest on the Net Investment (or portion thereof shall accrue at the Commercial Paper Rate, the Alternate Rate and/or the Default Rate as applicable, depending in part on the source of funds used by each Lender Group (as determined by, and in the sole discretion of, each applicable Managing Agent), to fund or maintain the Net Investment (or portion thereof) and shall be payable, without duplication:

(a)    on the Commitment Termination Date;

(b)    on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan pursuant to Section 4.1 or otherwise;

(c)    on each Distribution Date; and

(d)    on that portion of any Loans the Stated Maturity Date of which is accelerated pursuant to Section 11.2, immediately upon such acceleration.

SECTION 3.3  Fees.  Borrower agrees to pay the Administrative Agent, BAS and the Lenders certain fees in the amounts and on the dates set forth in that one or more letter agreements, dated as of the date hereof, among the Borrower, BAS and the Administrative Agent (collectively, the "Fee Letter").

SECTION 3.4  Computation of Interest and Fees.  All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days, provided, however, during any period in which interest and fees shall be calculated based on the Base Rate, such interest or fee is payable over a year comprised of 365 days or, if applicable, 366 days.

SECTION 3.5  Eurodollar Disruption Event.  Upon the occurrence of a Eurodollar Disruption Event, (a) the Administrative Agent or the applicable Lender or Managing Agent shall forthwith notify the Borrower of such event; and (b) while such circumstances exist, none of the related Conduit Lender, the related Alternate Lenders or such Managing Agent shall allocate any Portion of Net Investment with respect to Loans made by such Lender Group during such period to an Interest Period with respect to which interest is calculated by reference to the Eurodollar Rate (Reserve Adjusted).

## ARTICLE IV

## REPAYMENTS AND PREPAYMENTS; DISTRIBUTION OF COLLECTIONS

SECTION 4.1  Repayments and Prepayments.  Borrower shall repay in full the unpaid Net Investment on the Commitment Termination Date.  Prior thereto, Borrower:

(a)     may, from time to time on any Business Day, make a prepayment, in whole or in part, of the outstanding principal amount of any Net Investment; *provided*, *however*, that:

(i)     all such voluntary prepayments shall require at least two but no more than five Business Days' prior written notice to the Administrative Agent;

(ii)     all such voluntary partial prepayments shall be in a minimum amount of $250,000 and an integral multiple of $100,000 in excess thereof; and

(iii)     Borrower shall make no more than two such voluntary prepayments during any calendar month.

(b)     [Reserved];

(c)     shall, immediately upon any acceleration of the Stated Maturity Date pursuant to Section 11.2, repay the entire Net Investment;

(d)     shall, on the date Borrower receives any net proceeds from any Take-Out Securitization, make a prepayment of the Net Investment in an amount equal to such net proceeds; and

(e)     shall, if on any day a Borrowing Base Deficit exists, make a prepayment of the Net Investment in an amount equal to such Borrowing Base Deficit, such payment to be made (i) if, solely to the extent that the Net Investment at such time does not exceed the sum of the Borrowing Base, at such time, plus the amounts then on deposit in the Collection Account which are available for, and applicable to, the payment of principal on the Net Investment, on the next succeeding Distribution Date, and (ii) in all other cases, on the next Business Day to occur following the occurrence of such Borrowing Base Deficit.

Each such prepayment shall be subject to the payment of any amounts required by Section 7.1 resulting from a prepayment or payment of the Net Investment.

SECTION 4.2   Distribution of Collections.

(a)     Distribution Date Procedures.   All Collections on deposit in the Collection Account shall be distributed by the Servicer (or, following the Administrative Agent's assumption of control of the Collection Account pursuant to the terms of the Collection Account Agreement, the Administrative Agent) on each Distribution Date in the amounts specified in the related Monthly Report in the following order of priority:

first, to the payment of the accrued and unpaid Backup Servicing Fees for the immediately preceding calendar month (plus, if applicable, the amount of any Backup Servicing Fees payable for any prior calendar month to the extent such amount has not been distributed to the Backup Servicer);

second, to the payment of the accrued and unpaid Trustee Fees for the immediately preceding calendar month (plus, if applicable, the amount of any Trustee

Fees payable for any prior calendar month to the extent such amount has not been distributed to the Trustee);

third, to the payment of any accrued and unpaid Servicing Advance and any Advance Interest thereon (as such term is defined in the Servicing and Custodian Agreement), solely to the extent that (i) the related Obligor in respect of whose Warehouse Asset such Servicing Advance was made has made funds in the amount of such Servicing Advance (together with any applicable interest thereon) available to the Servicer or the Borrower and such amounts have been deposited into the Collection Account for application thereon pursuant to this Section 4.2, (ii) sufficient proceeds with respect to the liquidation of such related Warehouse Asset are received by the Servicer, or (iii) on or prior to such Distribution Date (but not earlier than the second Distribution Date following the Distribution Date immediately succeeding the date the Servicing Advance was made), the Servicer, in accordance with its standard procedures with respect thereto as set forth in its Credit Policy, provides written notice to the Administrative Agent of its reasonable determination that no further amounts are collectible in respect of such Warehouse Asset from the related Obligor;

fourth, if no Servicer Default has occurred and is continuing with respect to the related Servicer, to the payment of the accrued Servicing Fees payable for the immediately preceding calendar month (plus, if applicable, the amount of Servicing Fee payable for any prior calendar month to the extent such amount has not been distributed to the Servicer);

fifth, to the payment of interest accrued on the Net Investment during the related Interest Period (plus, if applicable, the amount of interest on the Net Investment accrued for any prior Interest Period to the extent such amount has not been distributed to the Lenders, and, to the extent permitted by law, interest thereon), and all amounts payable to the Lenders or any other Affected Party pursuant to Section 7.1;

sixth, to the payment of all Fees accrued during the immediately preceding Interest Period (plus, if applicable, the amount of Fees accrued for any prior Interest Period to the extent such amount has not been distributed to the Lender or other applicable party);

seventh, to the payment in respect of all or any portion of the outstanding Net Investment (including in connection with any Borrowing Base Deficit), to the extent due in accordance with Section 4.1; *provided, however*, that at all times (i) following the Commitment Termination Date and on and after the occurrence and during the continuation of any Event of Default, (ii) following the occurrence and during the continuation of a Change in Control of the type described in clause (c) of the definition thereof (determined without giving effect to the six month cure period referenced therein), (iii) the ERV Ratio shall be less than 93% for any two (2) of the most recent three (3) calendar months, or (iv) the Purchase Price Ratio shall be less than 115% for any two (2) of the most recent three (3) calendar months, all available Collections remaining in the Collection Account after application to the amounts described in clauses

first through sixth, above, shall be paid to the Administrative Agent on such Distribution Date for application to the outstanding Net Investment;

eighth, to the payment, on a pari passu basis, of all other Obligations (including any indemnities, costs, fees, expenses, taxes and/or interest) then payable by Borrower under this Agreement;

ninth, if at any time (i) the Net Spread Ratio (as calculated on or prior to such date) is less than 3% (the "Three-Percent Trigger") for any calendar month, to the Spread Account, in the amount (the "3% Trigger Required Reserve Amount") necessary to cause the amount on deposit therein to equal three (3) times the product of (A) the outstanding Net Investment at such time, times (B) the interest rate for the Net Investment for the prior calendar month, times (C) 1/12; or (ii) notwithstanding (but without duplicating) the amounts required to be deposited in the Spread Account pursuant to clause (i), above, if at any time the Net Spread Ratio (as calculated on or prior to such date) is less than 2% (the "Two-Percent Trigger") for any calendar month, to the Spread Account, in the amount (the "2% Trigger Required Reserve Amount") necessary to cause the amount on deposit therein to equal six (6) times the product of (A) the outstanding Net Investment at such time, times (B) the interest rate for the Net Investment for the prior calendar month, times (C) 1/12;

tenth, if a Servicer Default has occurred and is continuing with respect to the related Servicer, to the payment of the accrued Servicing Fees payable for the immediately preceding calendar month (plus, if applicable, the amount of Servicing Fee payable for any prior calendar month to the extent such amount has not been distributed to the Servicer);

eleventh, to the payment (without duplication) of all other amounts payable to the Trustee by the Borrower at such time pursuant to Section 6.01 of the Trust Agreement;

twelfth, to the payment (without duplication) of all other costs, expenses and other amounts, including Transition Costs (as defined in the Servicing and Custodian Agreement), payable at such time to the Backup Servicer pursuant to the Servicing and Custodian Agreement; and

thirteenth, so long as no Event of Default or Unmatured Event of Default shall be continuing, the balance, if any, to be paid to Borrower. On the date after the Commitment Termination Date, when all Obligations of the Borrower shall have been fully and finally paid and performed, any funds remaining in the Collection Account (after payment of all such Obligations) shall be paid to the Borrower.

SECTION 4.3  Spread Account.  (a)  On or prior to the funding of the initial Loan hereunder, the Borrower shall establish and maintain with the Spread Account Bank (or such other bank or financial institution acceptable to the Administrative Agent) in the Administrative Agent's name (for the benefit of the Secured Parties) a separate deposit account identified as the "Sequoia Funding Trust/Spread Account" (the "Spread Account"). The initial Spread Account is account numbered 4121142350 at Wells Fargo Bank, N.A. The Spread Account shall be used to

receive transfers of certain amounts of Collections pursuant to <u>clause ninth</u> of <u>Section 4.2</u> and for the other purposes described in <u>paragraph (b)</u>, below.  The Spread Account shall, at all times, be subject to a Spread Account Agreement (or any such other agreement establishing the Administrative Agent's "control" of such Spread Account for purposes of, and as defined in, the applicable UCC) in form and substance satisfactory to the Administrative Agent.  Subject to the use of such funds therein pursuant to <u>paragraph (b)</u>, below, and prior to an Event of Default or Unmatured Event of Default, funds on deposit in the Spread Account may be invested in Permitted Investments selected by the Servicer, so long as (i) either (A) such Permitted Investments are credited to a "securities account" (as defined in the applicable UCC) over which the Administrative Agent (for the benefit of the Secured Parties) shall have a first priority perfected security interest, (B) such Permitted Investments are purchased in the name of the Administrative Agent or (C) such Permitted Investments are held in another manner sufficient to establish the Administrative Agent's first priority perfected security interest over such Permitted Investments and (ii) such Permitted Investments are scheduled to mature prior to the Distribution Date following such investment.  All income and gain or loss realized from any such investment shall be credited or debited (as applicable) to the Spread Account.  The Administrative Agent shall have no obligation to reimburse the Spread Account for any losses realized by reason of such investments.

(b)    If on any Determination Date, there are insufficient funds on deposit in the Collection Account to make payments in respect of interest on the Net Investment pursuant to <u>clause fifth</u> of <u>Section 4.2</u>, the Servicer (or, if the Administrative Agent has exercised its control of such account pursuant to the Spread Account Agreement, the Administrative Agent) shall withdraw funds in the event of such shortfall out of the amounts on deposit in the Spread Account at such time and apply such funds to the payment of such interest; *provided, however*, that on and after the occurrence of any Event of Default, the Servicer (or if the Administrative Agent has exercised its control of such account pursuant to the Spread Account Agreement, the Administrative Agent) may use such amounts on deposit in the Spread Account to (i) make payments in respect of any outstanding Obligations of the Borrower to the Lenders (including for the payment of interest and principal on any outstanding Loans), until all such outstanding Obligations to the Lenders (and their assigns) have been paid in full, in each case, in the order of priority for such Obligations set forth in <u>Section 4.2</u> and/or (ii) if so requested by the Administrative Agent at such time (in its sole reasonable discretion), to purchase and maintain one or more Interest Rate Agreements, in form and substance (and with a counterparty) acceptable to the Administrative Agent, in order to hedge or otherwise protect against interest rate fluctuations.  On the date after the Commitment Termination Date when all Obligations of Borrower shall have been fully and finally paid and performed, the Servicer (or if the Administrative Agent has exercised its control of such account pursuant to the Spread Account Agreement, the Administrative Agent) shall pay to Borrower any funds remaining in the Spread Account.

(c)    If, on any date (i) following the occurrence of the Three-Percent Trigger pursuant to <u>clause ninth</u> of <u>Section 4.2</u>, the Net Spread Ratio (as calculated on or prior to such date) shall equal or exceed 3% for any three consecutive calendar months thereafter, then the amounts, if any, then on deposit in the Spread Account shall be released to the Borrower for its own account on the Distribution Date next succeeding the date of such determination, and (ii) following the occurrence of the Two-Percent Trigger pursuant to <u>clause ninth</u> of <u>Section 4.2</u>, the Net Spread

Ratio (as calculated on or prior to such date) shall equal or exceed 2% for any three consecutive calendar months thereafter, then, subject to the proviso below, the amounts, if any, then on deposit in the Spread Account shall be released to the Borrower for its own account on the Distribution Date next succeeding the date of such determination; *provided, however*, that if the Net Spread Ratio is greater than 2%, but less than 3%, for any of the three most recent calendar months, then notwithstanding anything to the contrary in clause (ii) of this Section 4.3(c), above, the amount on deposit in the Spread Account at such time shall, solely to the extent of the excess, if any, of the 2% Trigger Required Reserve Amount over the 3% Trigger Required Reserve Amount, at such time, be released to the Borrower for its own account on the Distribution Date next succeeding the date of such determination.

 SECTION 4.4  Draws on the Performance Guaranty.  If on any Determination Date occurring in any of the six calendar months following a Take-Out Securitization there are insufficient funds on deposit in the Collection Account or the Spread Account to make payments in respect of interest on the Net Investment pursuant to clause fifth of Section 4.2, the Servicer (or, in its sole discretion, the Administrative Agent) shall notify SNHC of such shortfall and that payment in the amount of such shortfall is due and payable into the Collection Account prior to the related Distribution Date in accordance with the terms of the Performance Guaranty.  Any amounts deposited into the Collection Account pursuant to the Performance Guaranty shall be applied to the payment of such interest.

**ARTICLE V**

**PAYMENTS**

 SECTION 5.1  Making of Payments.  Except as otherwise provided herein, all amounts to be paid or deposited by Borrower to or for the account of the Administrative Agent hereunder or under the Note, the Fee Letter or any other Transaction Document shall be paid or deposited in accordance with the terms hereof not later than 11:00 a.m. (New York City time) on the day when due in immediately available funds.  If such amounts are fees payable to the Administrative Agent (whether on behalf of any Lender or otherwise), they shall be paid or deposited in the account of the Administrative Agent indicated under the heading *"Payment Information"* in Schedule 15.3 or such other account as the Administrative Agent may specify from time to time by notice to the other parties hereto (the "Administrative Agent's Account").  If such amounts are payable to the Administrative Agent other than with respect to fees (whether on behalf of any Lender or Agent or otherwise), they shall also be paid or deposited in the Administrative Agent's Account or such other account as the Administrative Agent may specify from time to time by notice to the other parties hereto.  Borrower shall, to the extent permitted by law, pay to the Administrative Agent, for the benefit of the applicable party, upon demand, interest on all amounts not so paid or deposited when due hereunder or under the Note, the Fee Letter or any other Loan Document at an interest rate equal to 2.00% *per annum*, plus the Base Rate.  Any computations by the Administrative Agent of amounts payable or to be deposited by Borrower under this Agreement or under the Note or the Fee Letter shall be conclusive and binding absent manifest error.

 SECTION 5.2  [Reserved].

SECTION 5.3  Due Date Extension.  If any payment of principal or interest with respect to any Net Investment falls due on a day which is not a Business Day, then such due date shall be extended to the next following Business Day, and additional interest shall accrue and be payable for the period of such extension.

SECTION 5.4  Sharing of Payments, Etc.  If any Lender (for purposes of this Section 5.4 only, being a "Recipient") shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the portion of the Asset Interest owned by it (other than pursuant to the Fee Letter, Article XIV and other than a result of the different methods for calculating interest) in excess of its ratable share of payments on account of the Asset Interest obtained by the Lenders entitled thereto, such Recipient shall forthwith purchase from the Lenders entitled to a share of such amount participations in the portions of the Asset Interest owned by such Persons as shall be necessary to cause such Recipient to share the excess payment ratably with each such other Person entitled thereto; provided, however, that if all or any portion of such excess payment is thereafter recovered from such Recipient, such purchase from each such other Person shall be rescinded and each such other Person shall repay to the Recipient the purchase price paid by such Recipient for such participation to the extent of such recovery, together with an amount equal to such other Person's ratable share (according to the proportion of: (a) the amount of such other Person's required payment to (b) the total amount so recovered from the Recipient) of any interest or other amount paid or payable by the Recipient in respect of the total amount so recovered.

## ARTICLE VI

## ADDITIONAL ALTERNATE LENDER PROVISIONS

SECTION 6.1  Assignment to Alternate Lenders.

6.1.1  Assignment Amounts.  At any time on or prior to the Scheduled Commitment Termination Date, if the related Administrator on behalf of the applicable Conduit Lender so elects, by written notice to the Administrative Agent and its related Managing Agent, such Conduit Lender hereby assigns effective on the Assignment Date referred to below all or such portions as may be elected by such Conduit Lender of its interest in the Net Investment and the Asset Interest at such time to its Alternate Lenders pursuant to this Section 6.1 and the Borrower agrees to pay the amounts described in Section 6.1.2; provided, however, that unless such assignment is an assignment of all such Conduit Lender's interest in the Net Investment and the Asset Interest in whole on or after its Conduit Investment Termination Date, no such assignment shall take place pursuant to this Section 6.1 if an Event of Default described in Section 11.1.6 shall then exist; and provided, further, that no such assignment shall take place pursuant to this Section 6.1 at a time when an Event of Bankruptcy with respect to such Conduit Lender exists. No further documentation or action on the part of such Conduit Lender, the Borrower, or the applicable Alternate Lenders shall be required to exercise the rights set forth in the immediately preceding sentence, other than the giving of the notice by the related Administrator on behalf of such Conduit Lender referred to in such sentence and the delivery by the related Managing Agent of a copy of such notice to each Alternate Lender (the date of the receipt by Administrative Agent of any such notice being the "Assignment Date").  Each Alternate Lender in the applicable Lender Group hereby agrees, unconditionally and irrevocably and under all circumstances,

without set-off, counterclaim or defense of any kind, to pay the full amount of its Assignment Amount on such Assignment Date to such Conduit Lender in immediately available funds to an account designated by the related Managing Agent. Upon payment of its Assignment Amount, each such Alternate Lender shall acquire an interest in the Asset Interest and the Net Investment equal to its *pro rata* share (based on the outstanding portions of the Net Investment funded by it) of the Alternate Lender Percentage thereof. Upon any assignment in whole by a Conduit Lender to its Alternate Lenders on or after its Conduit Investment Termination Date as contemplated hereunder, such Conduit Lender shall cease to make any additional Loans hereunder. At all times prior to its Conduit Investment Termination Date, nothing herein shall prevent a Conduit Lender from making a subsequent Loan hereunder, in its sole discretion, following any assignment pursuant to this Section 6.1 or from making more than one assignment pursuant to this Section 6.1.

6.1.2   Additional Assignment Amounts. The Borrower shall pay to the Administrative Agent, for the account of the related Managing Agent for the benefit of such Conduit Lender, in connection with any assignment by a Conduit Lender to its Alternate Lenders pursuant to this Section 6.1, an aggregate amount equal to all interest to accrue through the end of the current Interest Period to the extent attributable to the portion of the Net Investment so assigned to the Alternate Lenders (as determined immediately prior to giving effect to such assignment), plus all other Obligations then due (including Obligations due pursuant to Sections 14.1 and 14.2), other than the Net Investment and other than any interest described above, attributable to such portion of the Net Investment so assigned. If the Borrower does not make payment of such amounts at or prior to the time of assignment by a Conduit Lender to its Alternate Lenders, such amount shall be paid by such Alternate Lenders (in accordance with their respective Pro Rata Shares) to the Conduit Lender as additional consideration for the interests assigned to the Alternate Lenders and the amount of the *"Net Investment"* hereunder held by such Alternate Lenders shall be increased by an amount equal to the additional amount so paid by such Alternate Lenders.

6.1.3   Administration of Agreement after Assignment from Conduit Lender to Alternate Lenders following the Conduit Investment Termination Date. After any assignment in whole by a Conduit Lender to its Alternate Lenders pursuant to this Section 6.1 at any time on or after its Conduit Investment Termination Date (and the payment of all amounts owing to such Conduit Lender in connection therewith), all rights of the related Administrator and the related Conduit Collateral Agent set forth herein shall be given to the applicable Managing Agent on behalf of its Alternate Lenders instead of such Administrator and Conduit Collateral Agent.

6.1.4   Payments to Administrative Agent. After any assignment in whole by a Conduit Lender to its Alternate Lenders pursuant to this Section 6.1 at any time on or after its Conduit Investment Termination Date, all payments to be made hereunder by Borrower to the Administrative Agent for the benefit of such Conduit Lender shall be made to the account specified by the applicable Managing Agent.

6.1.5   Recovery of Net Investment. In the event that the aggregate of the Assignment Amounts paid by the Alternate Lenders with respect to any Lender Group pursuant to this Section 6.1 on any Assignment Date occurring on or after the Conduit Investment Termination Date for the related Conduit Lender is less than the Net Investment of such Conduit Lender on such Assignment Date, then to the extent that payments or deposits thereafter received and

applied by the Administrative Agent with respect to such Lender Group under Section 4.2 clauses fifth and seventh in respect of the Net Investment exceed the aggregate of the unrecovered Assignment Amounts and Net Investment funded by such Alternate Lenders, such excess shall be remitted by the Administrative Agent to the related Conduit Collateral Agent.

SECTION 6.2  Downgrade of Alternate Lender.

6.2.1  Downgrades Generally.  If at any time on or prior to the Scheduled Commitment Termination Date, the short term debt rating of any related Alternate Lender shall be "A-2" or "P-2" from S&P or Moody's, respectively, with negative credit implications, such Alternate Lender, upon request of the related Managing Agent, shall, within thirty (30) days of such request, assign its rights and obligations hereunder to another financial institution (which institution's short term debt shall be rated at least "A-2" or "P-2" from S&P or Moody's, respectively, and which shall not be so rated with negative credit implications and which is acceptable to such Conduit Lender and such Managing Agent).  If the short term debt rating of such Alternate Lender shall be "A-3" or "P-3", or lower, from S&P or Moody's, respectively (or such rating shall have been withdrawn by S&P or Moody's), such Alternate Lender, upon request of the related Managing Agent, shall, within five (5) Business Days of such request, assign its rights and obligations hereunder to another financial institution (which institution's short term debt shall be rated at least "A-2" or "P-2", from S&P or Moody's, respectively, and which shall not be so rated with negative credit implications and which is acceptable to such Conduit Lender and such Managing Agent).  In either such case, if any such Alternate Lender shall not have assigned its rights and obligations under this Agreement within the applicable time period described above (in either such case, the "Required Downgrade Assignment Period"), the related Administrator on behalf of such Conduit Lender shall have the right to require such Alternate Lender to pay upon one (1) Business Day's notice at any time after the Required Downgrade Assignment Period (and each such Alternate Lender hereby agrees in such event to pay within such time) to the applicable Managing Agent an amount equal to such Alternate Lender's unused Commitment (a "Downgrade Draw") for deposit by such Managing Agent into an account, in the name of such Managing Agent (a "Downgrade Collateral Account"), which shall be in satisfaction of such Alternate Lender's obligations to make Loans and to pay its Assignment Amount upon an assignment from such Conduit Lender in accordance with Section 6.1; provided, however, that if, during the Required Downgrade Assignment Period, such Alternate Lender delivers a written notice to such Managing Agent of its intent to deliver a direct pay irrevocable letter of credit pursuant to this proviso in lieu of the payment required to fund the Downgrade Draw, then such Alternate Lender will not be required to fund such Downgrade Draw.  If any Alternate Lender gives the applicable Managing Agent such notice, then such Alternate Lender shall, within one (1) Business Day after the Required Downgrade Assignment Period, deliver to such Managing Agent a direct pay irrevocable letter of credit in favor of such Managing Agent in an amount equal to the unused portion of such Alternate Lender's Commitment, which letter of credit shall be issued through a United States office of a bank or other financial institution: (i) whose short-term debt ratings by S&P and Moody's are at least equal to the ratings assigned by such statistical rating organization to the Commercial Paper; and (ii) that is acceptable to such Conduit Lender, such Managing Agent and the Borrower.  Such letter of credit shall provide that such Managing Agent may draw thereon for payment of any Loan or Assignment Amount payable by such Alternate Lender which is not paid hereunder

when required, shall expire no earlier than the Scheduled Commitment Termination Date and shall otherwise be in form and substance acceptable to such Managing Agent.

6.2.2 <u>Application of Funds in Downgrade Collateral Account</u>. If any Alternate Lender in any Lender Group shall be required pursuant to this <u>Section 6.2</u> to fund a Downgrade Draw, then the related Managing Agent shall apply the monies in the Downgrade Collateral Account applicable to such Alternate Lender's Pro Rata Share of Loans required to be made by the related Alternate Lenders, to any Assignment Amount payable by such Alternate Lender pursuant to <u>Section 6.1</u> and to any purchase price payable by such Alternate Lender pursuant to <u>Section 6.1</u> at the times, in the manner and subject to the conditions precedent set forth in this Agreement. The deposit of monies in such Downgrade Collateral Account by any Alternate Lender shall not constitute a Loan or the payment of any Assignment Amount (and such Alternate Lender shall not be entitled to interest on such monies except as provided below in this <u>Section 6.2.2</u>), unless and until (and then only to the extent that) such monies are used to fund Loans or to pay any Assignment Amount or purchase price pursuant to <u>Section 6.1</u> or pursuant to the first sentence of this <u>Section 6.2.2</u>. The amount on deposit in such Downgrade Collateral Account shall be invested by the related Managing Agent in Eligible Investments as such Eligible Investments shall be selected by such Managing Agent in its sole discretion. Such Managing Agent shall remit to such Alternate Lender, on the last Business Day of each month, the income actually received thereon. Unless required to be released as provided below in this subsection, payments or deposits received by such Managing Agent in respect of such Alternate Lender's Portion of the Net Investment shall be deposited in the Downgrade Collateral Account for such Alternate Lender. Amounts on deposit in such Downgrade Collateral Account shall be released to such Alternate Lender (or the stated amount of the letter of credit delivered by such Alternate Lender pursuant to this <u>Section 6.2</u> may be reduced) within one Business Day after each Distribution Date following the Commitment Termination Date to the extent that, after giving effect to the distributions made and received by the Lenders on such Distribution Date, the amount on deposit in such Downgrade Collateral Account would exceed such Alternate Lender's Pro Rata Share (determined as of the day prior to the Commitment Termination Date) of the sum of all Portions of Net Investment then funded by the related Conduit Lender, *plus* the related Interest Component. All amounts remaining in such Downgrade Collateral Account shall be released to such Alternate Lender no later than the Business Day immediately following the earliest of: (i) the effective date of any replacement of such Alternate Lender or removal of such Alternate Lender as a party to this Agreement; (ii) the date on which such Alternate Lender shall furnish the related Managing Agent with confirmation that such Alternate Lender shall have short-term debt ratings of at least "A-2" or "P-2" from S&P and Moody's, respectively, without negative credit implications; and (iii) the Scheduled Commitment Termination Date. Nothing in this <u>Section 6.2</u> shall affect or diminish in any way any such downgraded Alternate Lender's Commitment to Borrower or its related Conduit Lender or such downgraded Alternate Lender's other obligations and liabilities hereunder and under the other Transaction Documents.

6.2.3 <u>Liquidity Agreement Downgrade Provisions</u>. Notwithstanding the other provisions of this <u>Section 6.2</u>, an Alternate Lender shall not be required to make a Downgrade Draw (or provide for the issuance of a letter of credit in lieu thereof) pursuant to <u>Section 6.2</u> at a time when such Alternate Lender has a downgrade collateral account (or letter of credit in lieu thereof) established pursuant to the Liquidity Agreement to which it is a party in an amount at least equal to its Commitment, and the related Managing Agent may apply monies in such

downgrade collateral account in the manner described in Section 6.2 as if such downgrade collateral account were a Downgrade Collateral Account.

SECTION 6.3  Request for Renewal of Commitments.  Not earlier than ninety (90) days prior to the Scheduled Commitment Termination Date, Borrower may request that the Alternate Lenders renew their Commitments hereunder for a period of up to 364 days from the then-current Scheduled Commitment Termination Date and the Alternate Lenders may, at their option, accept or reject such request.  To request a renewal, Borrower shall notify Administrative Agent of Borrower's request to have the Lenders renew their Commitments hereunder, and Administrative Agent shall promptly notify the Alternate Lenders of such request.  Each Alternate Lender shall notify Administrative Agent in writing within thirty (30) days after such request (the "Renewal Response Date") whether it consents to such renewal.  If any Alternate Lender shall fail to give such notice to Administrative Agent by the Renewal Response Date, such Alternate Lender shall be deemed to have rejected the requested extension.  If some but less than all of the Alternate Lenders consent to such renewal by the Renewal Response Date, the Borrower may arrange for an assignment to one or more financial institutions of all of the rights and obligations hereunder of each such non-consenting Alternate Lender in accordance with Section 13.2.  Any such assignment shall become effective on the then-current Scheduled Commitment Termination Date of such non-consenting Alternate Lender.  Each Alternate Lender which does not so consent to any renewal shall cooperate fully with Borrower in effectuating any such assignment.

## ARTICLE VII

## INCREASED COSTS, ETC.

SECTION 7.1  Breakage Costs.  Borrower shall pay Administrative Agent for the account of the Lenders, as applicable, on demand, such amount or amounts as shall compensate the Lenders for any loss (including loss of profit), cost or expense incurred by the Lenders (as reasonably determined by the applicable Managing Agent) as a result of any reduction of any Portion of Net Investment other than on a regularly scheduled Distribution Date or the maturity date of the Commercial Paper (or other financing source) funding such Portion of Net Investment (which maturity dates the Administrative Agent shall endeavor to inform the Servicer of from time to time), such compensation to be: (a) limited to an amount equal to any loss or expense suffered by the applicable Lenders during the period from the date of receipt of such repayment to the maturity date of such Commercial Paper (or other financing source); and (b) net of the income, if any, received by the recipient of such reduction from investing the proceeds of such reduction of such Portion of Net Investment.  The determination by the applicable Managing Agent of the amount of any such loss or expense shall be set forth in a written notice to Borrower in reasonable detail and shall be conclusive and binding, absent manifest error.

SECTION 7.2  Indemnity for Taxes, Reserves and Expenses.

(a)  Requirement of Law.  If after the Closing Date, the adoption of any Requirement of Law or bank regulatory guideline or any amendment or change in the administration, interpretation or application of any existing or future Requirement of Law or bank regulatory guideline (whether or not such adoption, amendment or change was proposed prior to the

Closing Date) by any Governmental Authority charged with the administration, interpretation or application thereof, or the compliance with any directive of any Governmental Authority (in the case of any bank regulatory guideline, whether or not having the force of any Requirement of Law):

(i)      shall subject any Affected Party (or its applicable lending office) to any tax, duty or other charge (other than Excluded Taxes) with respect to this Loan Agreement, the other Transaction Documents, the ownership, maintenance or financing of the Asset Interest, Borrower, or payments of amounts due hereunder or under any other Transaction Document (collectively, the "Covered Matters"), or shall change the basis of taxation of payments to any Affected Party of amounts payable in respect of the Covered Matters or its obligation to advance funds hereunder, under a Liquidity Agreement or the credit or liquidity support furnished by a Liquidity Bank or otherwise in respect of the Covered Matters (except for changes in the rate of general corporate, franchise, net income or other income tax imposed on such Affected Party);

(ii)      shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including any such requirement imposed by the Board of Governors of the Federal Reserve System) against assets of, deposits with or for the account of, or credit extended by, any Affected Party or shall impose on any Affected Party or on the United States market for certificates of deposit or the London interbank market any other condition affecting the Covered Matters or its obligation to advance funds hereunder, under a Liquidity Agreement or the credit or liquidity support provided by a Liquidity Bank or otherwise in respect of the Covered Matters; or

(iii)      imposes upon any Affected Party any other condition or expense (including any loss of margin, reasonable attorneys' fees and expenses, and expenses of litigation or preparation therefor in contesting any of the foregoing) with respect to the Covered Matters or its obligation to advance funds hereunder or under a Liquidity Agreement or the credit or liquidity support furnished by a Liquidity Bank or otherwise in respect of Covered Matters;

and the result of any of the foregoing is to increase the cost to or to reduce the amount of any sum received or receivable by such Affected Party with respect to the Covered Matters, the obligations hereunder, the funding of any purchases hereunder or under a Liquidity Agreement, by an amount deemed by such Affected Party to be material, then, within ten (10) days after demand by such Affected Party through the Administrative Agent, Borrower shall pay to Administrative Agent, for the benefit of such Affected Party, such additional amount or amounts as will compensate such Affected Party for such increased cost or reduction.

(b)      Capital Adequacy.  If any Affected Party shall have determined that after the date hereof, the adoption of any Requirement of Law or bank regulatory guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, or any request or directive regarding capital adequacy (in the case of any bank regulatory guideline, whether or not having the force of law) of any such Governmental Authority, has or would have the effect of reducing the rate of return on capital of such Affected Party (or its parent) as a consequence of such Affected Party's obligations

hereunder or with respect hereto to a level below that which such Affected Party (or its parent) could have achieved but for such adoption, change, request or directive (taking into consideration its policies with respect to capital adequacy) by an amount deemed by such Affected Party to be material, then from time to time, within ten (10) days after demand by such Affected Party through the Administrative Agent, Borrower shall pay to the Administrative Agent, for the benefit of such Affected Party, such additional amount or amounts as will compensate such Affected Party (or its parent) for such reduction. For avoidance of doubt, any interpretation or implementation of Accounting Research Bulletin No. 51 by the Financial Accounting Standards Board occurring after the Closing Date (including Interpretation No. 46: Consolidation of Variable Interest Entities) shall constitute an adoption, change, request or directive, and any implementation thereof shall be, subject to this Section 7.2(b).

(c)     Notice. The Affected Party shall promptly notify the Administrative Agent (if the Administrative Agent is not the Affected Party) and Borrower of any event of which it has knowledge, occurring after the date hereof, which will entitle the Affected Party to compensation pursuant to this Section 7.2; *provided* that no failure to give or any delay in giving such notice shall affect the Affected Party's right to receive such compensation. A notice by the Administrative Agent or the applicable Affected Party claiming compensation under this Section 7.2 and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error. In determining such amount, the Administrative Agent or any applicable Affected Party may use any reasonable averaging and attributing methods.

(d)     Additional Costs. Anything in this Section 7.2 to the contrary notwithstanding, if a Conduit Lender enters into agreements for the acquisition of interests in receivables or other financial assets from, or for loans to be made to, one or more Other Borrowers, such Conduit Lender shall allocate the liability for any amounts under this Section 7.2 which are in connection with a Liquidity Agreement or the credit or liquidity support provided by a Liquidity Bank ("Additional Costs") to Borrower and each Other Borrower; *provided, however*, that if such Additional Costs are attributable to Borrower and not attributable to any Other Borrower, Borrower shall be solely liable for such Additional Costs or if such Additional Costs are attributable to Other Borrowers and not attributable to Borrower, such Other Borrowers shall be solely liable for such Additional Costs.

SECTION 7.3  Taxes. All payments and distributions made hereunder by Borrower or the Servicer (each, a "payor") to any Lender or Agent (each, a "recipient") shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and any other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority on any recipient (or any assignee of such parties) (such non-excluded items being called "Taxes"), but excluding franchise taxes imposed on the recipient and taxes imposed on or measured by the recipient's net income or gross receipts ("Excluded Taxes"). In the event that any withholding or deduction from any payment made by the payor hereunder is required in respect of any Taxes, then such payor shall:

(a)     pay directly to the relevant authority the full amount required to be so withheld or deducted;

(b)      promptly forward to the Administrative Agent an official receipt or other documentation satisfactory to the Administrative Agent evidencing such payment to such authority; and

(c)      pay to the recipient such additional amount or amounts as is necessary to ensure that the net amount actually received by the recipient will equal the full amount such recipient would have received had no such withholding or deduction been required.

Moreover, if any Taxes are directly asserted against any recipient with respect to any payment received by such recipient hereunder, the recipient may pay such Taxes and the payor will promptly pay such additional amounts (including any penalties, interest or expenses) as shall be necessary in order that the net amount received by the recipient after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such recipient would have received had such Taxes not been asserted.

If the payor fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to the recipient the required receipts or other required documentary evidence, the payor shall indemnify the recipient for any incremental Taxes, interest, or penalties that may become payable by any recipient as a result of any such failure.

## ARTICLE VIII

## CONDITIONS TO BORROWING

The making of any Loan hereunder is subject to the following conditions precedent:

SECTION 8.1   Initial Loan.  The obligation of the Lenders to enter into this Agreement and to convert the Loans currently existing under the Original Loan Agreement into Loans under this Agreement is, in addition to the conditions precedent specified in Section 8.2, subject to the condition precedent that the Administrative Agent shall have received all of the following, each duly executed and dated the date hereof (or such earlier date as shall be satisfactory to the Administrative Agent), in form and substance satisfactory to the Administrative Agent:

8.1.1  Resolutions; Corporate Documents.  Certified copies of resolutions of each of Borrower, SNHC, each other Seller and the Servicer authorizing or ratifying the execution, delivery and performance, respectively, of this Agreement, the Note and the other Transaction Documents dated as of the date hereof, to which it is a party.

8.1.2  Consents, etc.  Certified copies of all documents evidencing any necessary consents and governmental approvals (if any) with respect to this Agreement, the Note and the other Transaction Documents dated as of the date hereof.

8.1.3  Incumbency and Signatures.  A certificate of the Secretary or an Assistant Secretary or Trustee of each of Borrower, SNHC, each other Seller and the Servicer certifying the names of its officer or officers authorized to sign this Agreement and the other Transaction Documents dated as of the date hereof to which it is a party.

8.1.4 <u>Good Standing Certificates</u>. Good standing certificates for the Borrower, SNHC, each other Seller and the Servicer issued as of a recent date acceptable to the Administrative Agent by (a) the Secretary of State of the jurisdiction of such Person's organization, and (b) the Secretary of State of the jurisdiction where such Person's chief executive office and principal place of business are located.

8.1.5 <u>Financing Statements</u>. (i) Acknowledgment copies of proper financing statements (Form UCC-3), filed on or prior to the date hereof, naming the Borrower as debtor and the Administrative Agent (on behalf of the Secured Parties) as the secured party as may be necessary or, in the opinion of the Administrative Agent, desirable under the UCC to perfect the Administrative Agent's security interest in the Collateral on behalf of the Secured Parties, (ii) acknowledgement copies of proper financing statements (Form UCC-1) filed on or before the date hereof pursuant to the Sale and Contribution Agreement (Middle Tier) naming SNHC as debtor/seller, SNBOA, LLC as buyer/assignor and the Administrative Agent (on behalf of the Secured Parties), as secured party/assignee, (iii) acknowledgement copies of proper financing statements (Form UCC-3), filed on or prior to the date hereof pursuant to the Sale and Contribution Agreement, naming SNBOA, LLC as debtor/seller, the Borrower as buyer/assignor and the Administrative Agent (on behalf of the Secured Parties), as secured party/assignee, (iv) acknowledgement copies of financing statements (Form UCC-1) filed pursuant to the Purchase and Sale Agreement naming each applicable Seller thereunder as debtor/sellers, SNHC, as buyer/assignor and the Administrative Agent (on behalf of the Lenders), as secured party/assignee and (v) executed copies of proper Uniform Commercial Code Form UCC-3 financing statements (if any) necessary to release all liens and other Adverse Claims of any Person in the Collateral granted by any Person.

8.1.6 <u>Search Reports</u>. Written search reports provided to the Administrative Agent by a search service acceptable to the Administrative Agent, listing all effective financing statements that name Borrower, SNHC, SNBOA, LLC and each other Seller under the Purchase and Sale Agreement as debtor or assignor and that are filed in the jurisdictions in which filings were made pursuant to <u>Section 8.1.5</u> of the Original Loan Agreement and in such other jurisdictions that Administrative Agent shall reasonably request, together with copies of such financing statements (none of which shall cover any Collateral or interests therein or proceeds of any thereof), and tax and judgment lien search reports from a Person satisfactory to the Administrative Agent showing no Adverse Claims filed against Borrower, SNHC, SNBOA, LLC or any other Seller.

8.1.7 [Reserved].

8.1.8 <u>Fee Letter; Payment of Fees</u>. The Fee Letter, together with all Fees payable pursuant to the Fee Letter and all costs and expenses due and payable pursuant to <u>Section 15.4</u>, if then invoiced.

8.1.9 <u>Transaction Documents</u>. (i) Duly executed and delivered counterparts of this Agreement, the Note and all other Transaction Documents dated the date hereof, and any documents, agreements and instruments contemplated thereby.

8.1.10 <u>Opinions of Counsel</u>. Favorable opinions of counsel to the Borrower, SNHC, SNBOA, LLC, the Servicer, the other Sellers, the Custodian and the Trustee, in each case, in

form and substance reasonably acceptable to the Administrative Agent and as to such corporate, UCC, bankruptcy and other matters as the Administrative Agent may request.

8.1.11 <u>Borrowing Base Certificate</u>. A Borrowing Base Certificate duly executed by a Financial Officer showing a calculation of the Borrowing Base as of the date thereof, which Borrowing Base Certificate does not contain a Borrowing Base Deficit.

8.1.12 <u>Receipt of Financial Information</u>. Receipt by the Lenders of such financial information regarding the Borrower, SNHC and the Servicer as the Administrative Agent may reasonably request.

8.1.13 <u>Other</u>. Such other documents, instruments or opinions as the Administrative Agent may reasonably request.

SECTION 8.2 <u>All Loans</u>. The making of the initial Loan hereunder and each subsequent Loan are subject to the following further conditions precedent that:

8.2.1 <u>No Default, etc.</u> (a) No Event of Default or Unmatured Event of Default has occurred and is continuing or will result from the making of such Loan, (b) the representations and warranties of Borrower contained in <u>Article IX</u> are true and correct as of the date of such requested Loan, with the same effect as though made on the date of such Loan, (c) after giving effect to such Loan, the Net Investment at such time shall not exceed the Maximum Outstanding Principal Balance and (d) no Change in Control of the type described in <u>clause (c)</u> of the definition thereof (determined without giving effect to the six month cure period referenced therein) has occurred and is continuing.

8.2.2 <u>Borrowing Request, etc.</u> The Agent shall have received the following:  (a) a Borrowing Request for such Loan three (3) Business Days prior to the proposed Loan Date in accordance with <u>Section 2.2</u> (which may be a facsimile transmission of a properly completed and executed Borrowing Request followed on that same day with actual delivery of the original thereof), together with all items required to be delivered in connection therewith; (b) a completed Borrowing Base Certificate setting forth a calculation of the Borrowing Base as of the close of business on the date prior to the day of the proposed borrowing; (c) an updated, supplemented or amended Schedule of Warehouse Assets, identifying the Eligible Warehouse Assets to be included in the Collateral; (d) written confirmation from the Custodian, certifying its receipt, in accordance with the terms of the Servicing and Custodian Agreement, of all items required to be delivered to it on or prior to any Loan pursuant to Section 3.01 of the Servicing and Custodian Agreement, with respect to any applicable Warehouse Assets being funded in connection with such Loan.

8.2.3 <u>Commitment Termination Date</u>. The Commitment Termination Date shall not have occurred.

8.2.4 <u>Requisite Releases</u>. The Borrower has received (and delivered to the Administrative Agent to the extent requested) any required releases or acknowledgments from creditors of the Sellers.

# ARTICLE IX

## REPRESENTATIONS AND WARRANTIES

In order to induce Lenders and the Agents to enter into this Agreement and, in the case of the Lenders, to make Loans hereunder, Borrower hereby represents and warrants to the Agents and the Lenders as follows:

SECTION 9.1 Organization and Good Standing, etc. Borrower has been duly organized and is validly existing as a Delaware statutory trust in good standing under the laws of the State of Delaware, with power and authority to own its properties and to conduct its business as such properties are presently owned and such business is presently conducted. It is duly licensed or qualified to do business as a foreign business trust in good standing in the jurisdiction where its principal place of business and chief executive office are located and in each other jurisdiction in which the failure to be so licensed or qualified would be reasonably likely to have a Material Adverse Effect.

SECTION 9.2 Power and Authority; Due Authorization. Borrower has (a) all necessary power, authority and legal right to (i) execute, deliver and perform its obligations under this Agreement and each of the other Transaction Documents to which it is a party, and (ii) to borrow on the terms and subject to the conditions herein provided, and (b) duly authorized by all necessary organizational action the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party and the borrowing and the granting of security therefor, on the terms and conditions provided herein and in the Security Agreement.

SECTION 9.3 No Violation. The consummation of the transactions contemplated by this Agreement and the other Transaction Documents and the fulfillment of the terms hereof and thereof will not (a) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, (i) the organizational documents of the Borrower, or (ii) any indenture, loan agreement, pooling and servicing agreement, purchase agreement, mortgage, deed of trust, or other agreement or instrument to which Borrower is a party or by which it or any of its respective properties is bound, (b) result in or require the creation or imposition of any Adverse Claim upon any of its properties pursuant to the terms of any such indenture, loan agreement, pooling and servicing agreement, purchase agreement, mortgage, deed of trust, or other agreement or instrument, other than the Transaction Documents, or (c) violate any law or any order, rule, or regulation applicable to the Borrower or of any court or of any federal, state or foreign regulatory body, administrative agency, or other governmental instrumentality having jurisdiction over the Borrower or any of its properties.

SECTION 9.4 Validity and Binding Nature. This Agreement is, and the other Transaction Documents to which it is a party when duly executed and delivered by the Borrower will be, the legal, valid and binding obligation of the Borrower enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such enforceability is considered in effect or at law.

SECTION 9.5  Bulk Sales Act.  No transaction contemplated by this Agreement or any of the other Transaction Documents requires compliance with, or will be subject to avoidance under, any bulk sales act or similar law.

SECTION 9.6  Government Approvals.  No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body required of the Borrower for the due execution, delivery or performance by Borrower of any Transaction Document to which it is a party remains unobtained or unfiled.

SECTION 9.7  Financial Condition.

(a)      Borrower's balance sheet as of a recent date, certified by the Financial Officer, copies of which have been furnished to the Agents and Lenders, fairly presents the Borrower's assets and liabilities at such date.

(b)      Since December 31, 2005, no event has occurred that has had, or is reasonably likely to have, a Material Adverse Effect.

SECTION 9.8  Margin Regulations.  The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Loans, directly or indirectly, will be used for a purpose that violates, or would be inconsistent with, Regulations T, U and X promulgated by the Federal Reserve Board from time to time.

SECTION 9.9  Quality of Title.  The Collateral, including without limitation, the Warehouse Assets, in which a security interest is to be granted to the Administrative Agent (on behalf of the Secured Parties) pursuant to the Security Agreement shall be owned by Borrower free and clear of any Adverse Claim.  The Security Agreement creates a valid security interest in favor of the Administrative Agent (on behalf of the Secured Parties) in the Collateral, including without limitation the Warehouse Assets, which security interest has been perfected (free and clear of any Adverse Claim) as security for the Obligations.  No effective financing statement, mortgage (or assignment thereof) or other instrument similar in effect covering any of the Collateral, any Related Security or any interest therein, in each case constituting an Adverse Claim, is on file in any recording office except for financing statements and/or assignments that may be filed (i) in favor of the Administrative Agent (on behalf of the Secured Parties) in accordance with the Security Agreement, (ii) in favor of Borrower (and assigned to the Administrative Agent (on behalf of the Secured Parties)) in accordance with the Sale and Contribution Agreement, (iii) in favor of SNBOA (and assigned to the Administrative Agent (or behalf of the Secured Parties)) in accordance with the Sale and Contribution Agreement (Middle Tier), (iv) in favor of SNHC (and assigned to the Administrative Agent (on behalf of the Secured Parties)) in accordance with the Purchase and Sale Agreement, or (v) in connection with any Adverse Claim arising solely as the result of any action taken by the Lenders or the Administrative Agent.

SECTION 9.10  Accuracy of Information.  All factual written information heretofore or contemporaneously furnished by Borrower, SNHC, the Servicer, or any of their respective agents or advisors, to any Agent or Lender for purposes of or in connection with any Transaction Document or any transaction contemplated thereby is, and all other such factual, written

information hereafter furnished by Borrower, SNHC, or the Servicer, or any of their respective agents or advisors, to any Agent or Lender pursuant to or in connection with any Transaction Document will be, true and accurate in every material respect on the date as of which such information is dated or certified. No information contained in any report or certificate delivered pursuant to this Agreement or any other Transaction Document shall be incomplete by omitting to state a material fact or any fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading on the date as of which such information is dated or certified.

SECTION 9.11  Offices. The principal place of business and chief executive office of Borrower is located at the address referred to on Schedule 15.3.

SECTION 9.12  Capitalization. The entire beneficial ownership of the Borrower has been validly issued, fully paid and nonassessable and owned (beneficially and of record), free and clear of any Adverse Claim, by SNHC. The Borrower has no Subsidiaries.

SECTION 9.13  Trade Names. The Borrower does not use any trade name other than its actual corporate name. From and after the date that fell five (5) years before the Closing Date, Borrower has not been known by any legal name other than its corporate name on the date hereof, nor has Borrower been the subject of any merger or other corporate reorganization.

SECTION 9.14  Taxes. Borrower has filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges thereby shown to be owing, except any such taxes or charges that are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with MCBA shall have been set aside on its books.

SECTION 9.15  Compliance with Applicable Laws; Licenses, etc. (a) Each of Borrower and Servicer is in compliance with the requirements of all applicable laws, rules, regulations, and orders of all governmental authorities (including, without limitation, the Federal Consumer Credit Protection Act, as amended, Regulation Z of the Board of Governors of the Federal Reserve System, as amended, laws, rules and regulations relating to usury, truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy, all other consumer laws, rules and regulations applicable to the Warehouse Assets, a breach of any of which, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect. Borrower is in compliance with all applicable laws and regulations regarding anti-money laundering and anti-terrorism funding, including, without limitation, those implemented by the U.S. Office of Foreign Assets Control, the Bank Secrecy Act, the USA Patriot Act and other similar applicable laws or regulations).

(b)      Borrower has not failed to obtain any licenses, permits, franchises or other governmental authorizations necessary to the ownership of its properties or to the conduct of its business (including, without limitation, as may be necessary in any applicable jurisdiction in connection with the ownership of the Warehouse Assets), which violation or failure to obtain would be reasonably likely to have a Material Adverse Effect.

SECTION 9.16  No Proceedings.

40157540.10 05049576                                      -52-

(a)     There is no order, judgment, decree, injunction, stipulation or consent order of or with any court or other government authority to which Borrower is subject, and there is no action, suit, arbitration, regulatory proceeding pending, or, to the knowledge of Borrower, threatened, nor, to the Borrower's knowledge, is there any investigation pending or threatened before or by any court, regulatory body, administrative agency or other tribunal or governmental instrumentality, against Borrower that, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect; and

(b)     there is no action, suit, proceeding, or arbitration pending, or to Borrower's knowledge, any regulatory or governmental investigation pending or, to the knowledge of Borrower, threatened, before or by any court, regulatory body, administrative agency, or other tribunal or governmental instrumentality (A) asserting the invalidity of this Agreement, the Note or any other Transaction Document, or (B) seeking to prevent the issuance of the Note or the consummation of any of the other transactions contemplated by this Agreement or any other Transaction Document.

SECTION 9.17  Investment Company Act, Etc.  Neither Borrower nor SNHC is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company", or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

SECTION 9.18  Eligible Warehouse Assets.  Each Warehouse Asset included in the Borrowing Base as an Eligible Warehouse Asset on the date of any Borrowing Base Certificates or the date of the funding of any Loans shall be an Eligible Warehouse Asset as of such date.

SECTION 9.19  UCC Representations, Warranties and Agreements.  The Borrower hereby makes the following UCC representations, warranties and agreements with respect to the Collateral:

(a)     Generally.

(i)     Creation.  The Security Agreement creates a valid and continuing security interest (as defined in the applicable UCC) in the Collateral in favor of the Administrative Agent (on behalf of the Secured Parties), which security interest is prior to all other Adverse Claims, and is enforceable as such as against creditors of and purchasers from the Borrower.

(ii)     Nature of Mortgage Loans.  The right to receive payments in respect of the Mortgage Loans and the other Warehouse Assets (except, solely in the case of the REO Properties, to the extent Article 9 of the applicable UCC does not apply thereto) constitute either "accounts," "general intangibles", or "instruments" within the meaning of the applicable UCC.

(iii)     Ownership of Collateral.  The Borrower owns (or, when acquired, will own) and has (or, when acquired, will have) good title to the Collateral free and clear of any Adverse Claim.

(iv)    Perfection.  Borrower has caused, not later than the closing date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under the UCC as necessary in order to perfect the security interest granted therein from the Borrower to the Administrative Agent (on behalf of the Secured Parties) under the Security Agreement.

(v)    Instruments.  With respect to any right to receive payments in respect of the Mortgage Loans that is or may constitute "instruments", the Custodian (or any other Person acting as such appointed by the Administrative Agent), acting as bailee for the benefit of the Administrative Agent has in its possession the original copies of such instrument that constitute or evidence such right to receive payment, and the Borrower has caused, not later than the closing date, the filing of financing statements described in clause (iv), above, each of which will contain a statement to the effect that: "A purchase of or security interest in any collateral described in this financing statement will violate the rights of the Lenders."  The Mortgage Loans to the extent they are evidenced by "instruments" do not have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Administrative Agent (on behalf of the Secured Parties).  With respect to any Mortgage Loans that constitute "instruments," there is only one original of each such Mortgage Loan.

(b)    The Collection Account.

(i)    Nature of Collection Account.  The Collection Account constitutes a "deposit account" within the meaning of the applicable UCC.

(ii)    Ownership.  The Borrower or the Administrative Agent for the benefit of the Secured Parties owns and has good and marketable title to the Collection Account free and clear of any Adverse Claim.

(iii)    Perfection.  The Borrower has delivered to the Administrative Agent a fully executed blocked account or similar agreement with respect to the Collection Account which provides the Administrative Agent with "control" over the Collection Account (for purposes of the applicable UCC), and pursuant to which the applicable bank at which the Collection Account is maintained has agreed, to comply with all instructions originated by the Administrative Agent (on behalf of the Secured Parties) directing the disposition of funds in the Collection Account without further consent by the Borrower or the Servicer.

(c)    Priority.

(i)    Other than the security interest in the Collateral granted by the Borrower to the Administrative Agent (on behalf of the Secured Parties) under the Security Agreement, the Borrower has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral, except for any such pledge, grant or other conveyance which has been released or terminated on or prior to the Closing Date.  The Borrower has not authorized the filing of, nor is the Borrower aware of, any financing statement against the Borrower that includes a description of any of the Collateral and

constitutes an Adverse Claim, other than any financing statement (i) relating to the security interest granted to the Administrative Agent (on behalf of the Secured Parties) under the Security Agreement, or (ii) that has been released or terminated.

(ii)     No ERISA or tax lien filings exist against the Borrower.

(iii)    The Collection Account is not in the name of any person other than the Borrower or the Administrative Agent (on behalf of the Secured Parties). Neither the Borrower nor the Servicer has consented to any bank maintaining the Collection Account to comply with instructions of any Person other than the Administrative Agent.

(d)    <u>Survival of Supplemental Representations</u>. Notwithstanding any other provision of this Agreement or any other Transaction Document, the representations contained in this <u>Section 9.19</u> shall be continuing, and remain in full force and effect until such time as all obligations under this Agreement and the Transaction Documents have been finally and fully paid and performed.

(e)    <u>No Waiver</u>. The parties to this Agreement (to the extent required pursuant to the terms of any short-term note program of the Conduit Lenders): (i) shall not, without obtaining a confirmation of the then-current rating of the Commercial Paper, waive any of the representations set forth in this <u>Section 9.19</u>; (ii) shall provide the Rating Agencies with prompt written notice of any material breach of any representations set forth in this <u>Section 9.19</u>, and shall not, without obtaining a confirmation of the then-current rating of the Commercial Paper of the Conduit Lenders (as determined after any adjustment or withdrawal of the ratings following notice of such breach) waive a material breach of any of the representations set forth in this <u>Section 9.19</u>.

(f)    <u>Servicer and Borrower to Maintain Perfection and Priority</u>. In order to evidence the interests of Administrative Agent (on behalf of the Secured Parties) under this Agreement, the Borrower (or the Servicer on its behalf) shall, from time to time, take such action or execute and deliver such instruments as may be necessary or advisable (including, without limitation, such actions as are reasonably requested by the Administrative Agent) to maintain and perfect the security interest of the Administrative Agent (on behalf of the Secured Parties) in the Collateral free and clear of all Adverse Claims. The Borrower (or the Servicer on its behalf) shall, from time to time and within the time limits established by law, prepare and present to the Administrative Agent for authorization and approval, all financing statements, amendments, continuations or initial financing statements in lieu of a continuation statement, or other filings necessary to continue, maintain and perfect the Administrative Agent's security interest free and clear of all Adverse Claims. The Administrative Agent's approval of such filings shall authorize the Borrower (or the Servicer on its behalf) to file such financing statements under the UCC without the signature of the Borrower or the Administrative Agent where allowed by applicable law. Notwithstanding anything else in this Agreement or the other Transaction Documents to the contrary, neither the Servicer nor the Borrower shall have any authority to file a UCC termination, partial termination, release, partial release, or any amendment that deletes the name of a debtor or excludes collateral of any such financing statements, without the prior written consent of the Administrative Agent; *provided* that nothing in this <u>Section 9.19(f)</u> shall limit the ability of the Servicer to obtain the release of any Warehouse Asset File pursuant to Section 4.12